JACOB CRIBBS v. JOSEPH M. SOWLE.

*Duress—Threats of criminal prosecution—Payment.*

Where a man 72 years of age is threatened with arrest and impris-
onment for an act which he denies committing, but on account
of his age and ignorance of the law is so put in fear as to
overcome his will, and cause him to pay the money demanded
because of a fear that he will be unjustly imprisoned on the
complaint of the person making the threat, and the testimony
of witnesses produced by him, such payment is made under
duress, and the money may be recovered as paid without con-
sideration.

Error to Berrien. (O'Hara, J.) Submitted on briefs,
July 2, 1891. Decided July 28, 1891.

*Assumpsit.* Plaintiff brings error. Reversed. The facts
are stated in the opinion.

*Spafford Tryon,* for appellant, contended:

1. Whenever a person is so situated as to exercise a controlling
   influence over the will of another, or when there exists coer-
   cion, threats, compulsion, and undue influence, and the party
   so influenced yields to such pressure, and makes a disposition
   of his money or property differently than he would if such
   influence had not been exerted, no title is made under a pos-
   session acquired through such agencies; citing *Seiber v. Price,* 26
   Mich. 519; *Gallaway v. Burr,* 32 Id. 332; *Lyon v. Waldo,* 36
   Id. 347; *Wisner v. Bardwell,* 38 Id. 278; *Vyne v. Glenn,* 41 Id.
   112; *Fosdick v. Van Arsdale,* 74 Id. 302; *Meech v. Lee,* 82 Id.
   274

*Theo. G. Beaver,* for defendant, contended:

1. Duress exists only where one, by the unlawful act of another,
   is induced to make a contract or perform some act under cir-
   cumstances which deprive him of the exercise of free will;
   citing *Hackley v. Headley,* 45 Mich. 574; 6 Amer. & Eng. Cyc.
   Law, 57.

2. To entitle the plaintiff to recover, it must appear that the money

was paid upon a wrongful claim or unjust demand, under the pressure of actual or threatened personal restraint or harm, or of an actual or threatened seizure or interference with his property of serious import to him, and that he could only escape from or prevent the injury by making such payment; citing *Kraemer* v. *Deustermann*, 37 Minn. 469; *Radich* v. *Hutchins*, 95 U. S. 213; *Mayor* v. *Lefferman*, 4 Gill, 425; *Mays* v. *Cincinnati*, 1 Ohio St. 278.

MORSE, J. This is an action of *assumpsit* upon the common counts commenced in justice's court. On appeal to the circuit court for the county of Berrien, the circuit judge directed a verdict for the defendant.

The case made by the plaintiff was substantially as follows: He is a farmer about 72 years of age, and has lived in Bainbridge, in Berrien county, upon his present farm, for nearly 40 years. There is an orchard on his premises, and he makes and sells cider. He had cider in his cellar in the spring of 1889. The defendant had a mill not far from plaintiff's, and teamsters in his employ drawing logs to the mill. Plaintiff had a sick horse in July, 1889, and called some of these teamsters in to help him about his horse, as they were passing by his place. After they had assisted him to "swing up" his horse, he drew some cider, which he claims had acid in it to keep it from fermenting, and treated them with it. Plaintiff was something of a horse-doctor, and a few days thereafter one Penrod, who was working for defendant with his own team, brought one of his horses to plaintiff to treat for sickness. The horse was brought to his place about 4 o'clock in the morning, and died in about seven hours. On the second day thereafter the defendant came into plaintiff's yard, and we give the conversation between them in the language of the plaintiff:

"I was preparing to go to the hay-field. I had cut down quite a lot of clover. I was fixing my hay-rack. Says he, 'Is this Mr. Cribbs?' I told him that was my

name. He says, 'I understand you have been selling my
men cider, and in consequence one of my men got drunk
Saturday before.' I cannot name the date of it,—it was
the Saturday before the horse died. 'He run his horse,
and caused his death, and I want pay for that horse. I
want pay for the horse.' I told him that was a mistake;
I never sold any of his men any cider in the world,—not
a drop. Says he, 'You have, and I can prove it by six
different witnesses that work for me,—men that work for
me.' Says I, 'Who are they?' Says he, 'I cannot name
them all, I have so many; a great many mills and so
many men. I hire so many men I don't know their
names.' He says, 'There are three at the mill, and there
are three others that will swear they got cider.' I says,
'That is a mistake.' He says: 'Mistake or not, I want
pay for that horse. My teams are lying idle. I have a
contract, and that contract has about expired, and, unless
I can keep my teams at work, I shall lose $1,000 on this
contract. I cannot give you any time on it. I want it
immediately,—right off.' I says: 'I don't see how you
can make that claim. I have no knowledge of their
getting any cider that would intoxicate any one, even to
the most delicate child there was, or woman.' Says he,
'It has been done, and I have got hold of the man now
that I have been looking for, and I want pay for it; my
team has got to go to work tomorrow. I cannot run
around any more. Unless you do, I shall send you up.
I shall fine you, or cause you to be fined, and send you
to Grand Rapids.' Says I, 'I don't understand the law.'
He spoke in the first place, and says, 'You know as
much about law as I do.' I says, 'I never had a case in
my life, never had a lawsuit; I don't know anything
about it.' 'Well,' says he, 'I have traveled over the
State of Michigan about as much as any other man, and
I know about as much law as most lawyers. I have had
a great many lawsuits in my life-time.' Says he, 'That
will be the least I can take, and the best I can do with
you, and give you no time.' I told him I had no money
by me.

"*Q.* You said something about his having you at
Grand Rapids. What did he say about that?

"*A.* He would have me arrested and take me to Grand
Rapids, in the U. S. court, and it would imprison me so
long a time, and $500 fine.

"*Q.* Did he state how long a time?

"*A.* Imprisonment?

"*Q.* Yes.

"*A.* I don't know as he came out on the time or years. I don't recollect that he did. He might have said a number of years. 'There will be no chance for you at all; it will be a sure thing.' Said he could prove it by three men down there. Wanted I should go down with him. I says, 'I have no time; my hay is in such a state I want to put my hands to work.' Says I, 'I cannot go.' 'Well,' says he, 'you better go.' 'Better go down,' says he, 'it will save a good deal of expense to you, probably.' So I went down."

Plaintiff admitted to Sowle that he gave the men some cider to drink, but protested that he did not sell it to them. Sowle told him that was enough to condemn him, as it was a sale. Plaintiff said he "could not see it in that light." Sowle replied, "I understand the law as well as most lawyers." Plaintiff and Sowle went down to the mill, and Sowle called up some of his men, and asked them in rotation, "Did you ever buy any cider of Mr. Cribbs?" and each one answered in the affirmative. Considerable more conversation between plaintiff and defendant took place between this time and the payment of the money; Cribbs trying to plead off or reduce the amount, and Sowle, insisting on the sum of $150 in money, or he would criminally prosecute the plaintiff for selling cider without a license. Finally Cribbs went down to Benton Harbor to get the money. While there he called upon Mr. Wiemer, a druggist, and who had been a sheriff or deputy-sheriff of the county, and asked his advice. Weimer said to him that he "guessed he had got in a boat." Plaintiff then went and got the money, and paid defendant $150. This is the money he is seeking to recover in this suit.

It was also shown by the testimony of Mr. Penrod, a witness for the plaintiff, that after his horse died the defendant came to Penrod, and asked him what he was

going to do. Penrod replied that he hardly knew what to do. Then Sowle said, "There is just one way that you can get a horse." On being asked how that was, he said that, if Penrod would swear that he bought cider of Cribbs, he (Sowle) could go and scare $150 out of him. Penrod said that he could not do that, as he never bought any cider of plaintiff. Sowle said the other boys had, and they would swear to it. Penrod also testified that he was present when Sowle called the men up in the presence of the plaintiff, and asked them if they had purchased cider of Cribbs, and heard them answer, "Yes." Plaintiff was also corroborated, as to his conversation in his own yard with Sowle, by Mr. Parker, his hired man, who heard most, if not all, of the talk there.

The defendant admitted getting $150 of Cribbs, and that he obtained it by reason of making the charge to him that he had been selling cider to his men, but denied that he had threatened any criminal prosecution. There was no proof in the case that plaintiff's letting the men have cider had anything to do whatever with the killing of the horse belonging to Penrod. The money, under all the testimony, was received by Sowle without any consideration for its payment, except the settlement of a threatened criminal prosecution. But the circuit judge was of the opinion that the plaintiff had "failed to show anything like duress;" and said to the jury that,—

"Under his own testimony, there is nothing that can be called such fear as the law will recognize; and, once a man sees fit to enter into an agreement of that kind, he cannot afterwards invoke the aid of the court to rid himself of a place which he has himself been the cause of falling into. Your verdict, without leaving your seats, will be that you find in favor of the defendant."

The judge in his remarks to the jury, a portion only of which has been given above, laid stress upon the fact

that plaintiff was remarkably strong and robust for one of his years, and had transacted more business than the average man in his walk of life; and also upon the further fact that plaintiff deliberated before the payment of the money, and counseled with a friend, "and paid the money with a full knowledge of all the facts."

The plain case is this: On Sowle's own showing, he has $150 of plaintiff's money without any consideration, and without the shadow of an excuse for a consideration. If the plaintiff's testimony is true, the money was extorted from him under the threat of a criminal prosecution in the United States court. He testified that he had sold cider by the barrel, and also sweet cider by the pitcher full and half gallon; but not to any of Sowle's men. He was ignorant of the law, and says that the reason he paid the money was that—

"Sowle's talk gave me a fright, scared me into it, not knowing anything about the law, never having any occasion to, and he claiming to be quite a lawyer himself, that he could make me. Thought I was compelled in my own mind to do it."

We do not think the plaintiff is debarred from recovering back this money so unjustly obtained from him. He had reason to fear a criminal prosecution when he was threatened with it, and confronted by three or four men who said that they had bought cider of him, and was informed by defendant that they would swear to it. Even if he had the average intelligence and business faculty of people in his walk in life, he can well be excused for thinking that he was in danger of being criminally prosecuted and perhaps jailed if he did not settle. He was ignorant of the law and had a horror of it; especially in the shape it was presented to him by the defendant. The fact that he consulted a friend, who told him he guessed he was in a boat, does not help the defend-

ant any. If it has any bearing, it is in favor of the plaintiff's case. There is no doubt, from plaintiff's showing, that he was threatened with unlawful arrest and imprisonment; that it excited a fear in him that the threat would be carried into execution if he did not pay the money; that this fear was grounded upon the reasonable belief that the person making the threat had the means of carrying his threat into immediate execution; and that the threat operated so as to overcome the will of the plaintiff; and we think, under such showing, he was entitled to recover.

As was well said by Gordon, J., in *Jordan v. Elliott,* 15 Cent. Law J. 232:

"We are aware that neither under the rule of the civil nor common law, as formerly expressed, would there be sufficient to release Mrs. Elliott [in that case] from her contract; for, according to Blackstone, the threats to produce such an effect must be of such a character as to induce a well-grounded fear in the mind of a firm and courageous man of the loss of life or limb. And the rule of the civil law was of like import; the fear must be of that kind which would influence a man of the greatest constancy,—*metus non vani hominis, sed qui in homine constantissimo cadat.* * * * But, fortunately for the weak and timid, courts are no longer governed by this harsh and inequitable doctrine, which seems to have considered only a very vigorous and athletic manhood, overlooking entirely women and men of weak nerves. Pothier regards this rule as too rigid, and approves the better doctrine, that regard must be had to the age, sex, and condition of the parties, since that fear which would be insufficient to influence a man in the prime of life and of military character might be deemed sufficient to avoid the contract of a woman, or a man in the decline of life. Evans' Poth. Obl. 1, 18. And we think the opinion of Mr. Evans expresses the doctrine which is now approved by the judicial mind, both of this country and of England; that is, that any contract produced by actual intimidation ought to be held void, whether as arising from the result of merely personal infirmity, or from circumstances which might produce a like effect upon

persons of ordinary firmness." See, also, And. Law Dict. p. 388.

It has been held by some of the courts that mere threats of criminal prosecution, when neither warrant has been issued or proceedings commenced, do not constitute duress (*Buchanan v. Sahlein,* 9 Mo. App. 552; *Higgins v. Brown,* 78 Me. 473; *Town Council v. Burnett,* 34 Ala. 400); and by others, that a threat of arrest for which there is no ground does not constitute duress, as the party could not be put in fear thereby (*Knapp v. Hyde,* 60 Barb. 80; *Preston v. Boston,* 12 Pick. 12). But these rules do not seem to have any regard to the condition of the mind of the person acted upon by the threat, or to take into consideration the age, disposition, or intellect of the person so threatened; and leaves the old, the ignorant, the weak, and the timid at the mercy of the bully or the scoundrel who operates upon their fears to extort money from them. Truly, to such an action as this the defendant, who, without semblance of any legal or moral right or claim, has scared money out of an old man, cannot well set up any defense of the policy of the law that it was the duty of the injured party to have resorted to the courts in the first place, or withstood the threat of being taken there until proceedings were actually begun, to defend himself from the extortion. Nor, in my opinion, is it the true policy of the law to make an arbitrary and unyielding rule in such cases, to apply to all alike, without regard to age, sex, or condition of mind. Weak and cowardly people and old and ignorant persons are the ones that need the protection of the courts, and they are the ones usually operated upon and influenced by threats and menaces.

This case should have gone to the jury, and if they found that the threat of criminal prosecution was made

as claimed by plaintiff, and that he, on account of his age and ignorance of the law, was so put in fear that his will was overcome, and he paid this money, not of his own free will, but because of the fear that he would be unjustly imprisoned on the complaint of Sowle, backed by the testimony of the witnesses he had been confronted with, then the verdict should have been in his favor for the money so paid, with interest.

The modern doctrine of duress is established where actual or threatened violence or restraint contrary to law compels one to enter into or discharge a contract. Bouv. Law Dict. It is duress when there is a fear of imprisonment excited by threats. Will, Eq. Jur. 209. A threat to procure the arrest and imprisonment of one's son under a false and criminal charge, and reasonable ground to believe that such threat will be executed, probably constitute duress. *Schultz v. Culbertson,* 46 Wis. 313; *Meech v. Lee,* 82 Mich. 274. See, also, *Schultz v. Catlin* (Wis.), 47 N. W. Rep. 946; *Eadie v. Slimmon,* 26 N. Y. 9; *Adams v. Bank,* 116 Id. 613 (23 N. E. Rep. 7); *Green v. Scranage,* 19 Iowa, 461; *Taylor v. Jaques,* 106 Mass. 291.

The judgment is reversed, and a new trial granted, with costs of this Court to plaintiff.

The other Justices concurred.