## HUSTON et al. v. DOMENY.

No. 6635—Opinion Filed Nov. 21, 1916.

Rehearing Denied June 25, 1918.

(173 Pac. 805.)

**1. Bills and Notes—"Duress"—Elements.**

To constitute duress which will be regarded as sufficient to render the execution of a promissory note involuntary, there must be an actual or threatened exercise of power, possessed by the party benefiting thereby, for the purpose of obtaining the note, such as to deprove the maker of that quality of mind essential to the making of a contract.

**2. Same—Sufficiency of Evidence.**

Evidence examined, and held, admitting all it tends to prove and all inferences reasonably deducible therefrom, that neither failure of consideration, duress, nor fraud or corruption inducing the execution of the note in suit is established.

(Syllabus by Bleakmore, C.)

Error from District Court, Noble County; W. M. Bowles, Judge.

Action by H. E. Domeny against J. E. Huston and Robert J. Huston. Judgment for plaintiff, and defendants bring error. Affirmed.

P. W. Cress, for plaintiffs in error.

Johnson, Robinson & Rice, for defendant in error.

Opinion by BLEAKMORE, C. On July 15, 1913, H. E. Domeny commenced this action against J. E. and R. J. Huston, seeking recovery on a promissory note in the sum of $150 of date May 3 1911, and payable December 3d. Defendants answered by way of general denial, and pleaded want of consideration and duress. Upon trial to a jury, at the close of the evidence, the court di-

rected a verdict for plaintiff, and defendants have appealed.

It appears from the evidence that in September, 1910, J. E. Huston applied to the superintendent of the Ponca Indian agency for the requisite departmental approval of a lease of an Indian allotment. The lease as submitted to the Indian Department provided for a drainage ditch along one side of the land, to be constructed at the cost of $150, and for this amount it was understood the lessee was to deposit a check. The lease was not approved until the following February. In the interim H. E. Domeny, by virtue of a contract with the agency officials, constructed such ditch in a manner apparently acceptable to the superintendent. J. E. Huston, claiming the right under his lease contract to personally construct the ditch and receive compensation therefor, protested against Domeny doing the work, and refused to deposit his check or subsequently pay for such work. While it appears that this lease was perhaps read in evidence it is not incorporated in the case-made, and its provisions in this regard cannot be determined. He also contended upon the trial that Domeny had merely deepened a ditch upon the highway left by the township trustees in the public road, at a cost of only about $30. Relative to his lease contract and the $150 check J. E. Huston testified:

"Q. Now, then, didn't Mr. Domeny come to his understanding right there at that time that he was to have this contract to make that ditch?

"Mr. Cress: We object to that as having been asked and answered.

"The Court: In your presence, with your consent, there at the agency?

"A. With my consent to him to have the contract.

"The Court: No; when you was there, and knew about it and accepted it, at the agency, did you make a contract with him to dig the ditch?

"Mr. Cress: While you was there, that you know anything about, is what the court wants to know.

"Q. At that time or any other time. A. Nothing only Dunbar the farmer had made this contract with Domeny himself, over me. I wanted the contract, and he ignored me and wouldn't let me have it. Q. Was that same matter talked over in the presence of Noble when you got up there to the agency? A. No, sir; it was not. Q. Was any part of it? A. No, sir. Q. Didn't Mr. Domeny go up to see Noble to see if that was the way it was to be? A. I don't know anything about it; it wasn't talked over with me. Q. Didn't Mr. Domeny go in there in your presence and ask if it was understood that you would put up a check for $150 if he did this work? A. Before Mr. Noble? Q. I think it was right there then. A. Not before none of them people he didn't, there. Q. Now. Mr. Huston, did you state to Mr. Noble that you would put up a check for $150? A. No, sir. Q. Did you state to Mr. Dunbar that you would? A. I said to Mr. Dunbar, if there is no other way for me to finish getting this lease approved only him to run this over me, I would put this check up. Q. You told him you would? A. If he run it over me, I would have to. Q. Did you make known to Mr. Domeny or Mr. Dunbar that anybody was running anything over you? A. I had nothing to say to Domeny or Dunbar. Q. You heard Mr. Dunbar tell him you were going to put up a certified check of $150? A. Yes, sir; I did."

On April 1, 1911, H. M. Noble, superintendent of the Ponca agency was succeeded by F. E. Farrell. Under these circumstances on May 3, 1911, the defendant R. J. Huston, who had agreed with another allottee for a lease upon a different tract of land, appeared at the Ponca Indian agency, accompanied by J. E. Huston, for the purpose of executing such lease and procuring the recommendation of the superintendent for its approval. The superintendent, Mr. Farrell, refused to recommend the approval thereof until J. E. Huston had settled for the construction of the ditch above referred to by the execution of the note in suit signed by both J. E. and R. J. Huston. With reference to this transaction R. J. Huston testified that he objected to signing such note, informing the superintendent that he had no connection or interest in the former lease of his brother and was in no way responsible by reason thereof, or otherwise liable to Mr. Domeny. Again he testified that his brother also refused, for a time at least, to sign the note, claiming that he was not indebted to Domeny on account of the construction of the ditch. He further testified:

"A. I had nothing to do with the lease in controversy between him and Mr. Domeny about the ditch. I was trying to make a lease with this Mrs. Barnaby, and that was the lease that I was held up on, and he wouldn't O. K. it until this note was signed, and I talked to him quite a bit, and my brother refused to sign it, and Mr. Dunbar and Mr. Noble stepped out of the office. Q. Mr. Noble you mean? Do you mean Noble or Farrell? A. Or Farrell, the agent, stepped out of the room, and I talked to my brother, and I needed a place to live; I was living in a house that wasn't very good at the time, and I needed a place to take my family to, and this place had a good house on it. and I went in and signed this note and consider-

ed it that we were just giving up this $150 to get this lease. * * *

"The Court: Q. Mr. Huston, this note, so far as the Department was concerned, was payment of the contract that your brother had made with the Indian, was it not, to build a $150 ditch or expend that much money?

"Mr. Cress: Objected to as calling for a conclusion, the competency of the witness now shown, and incompetent, irrelevant, and immaterial.

"The Court: Overruled.

"Mr. Cress: We except.

"A. What was the question?

"The Court: You say you signed this note?' A. Yes,sir. Q. Your brother signed it? A. Yes, sir.

"The Court: It was from Domeny? A. Yes, sir.

"The Court: You knew it was for him? A. Yes, sir.

"The Court: What was it for? A. It was for to get this lease.

"The Court: I know, but what was it to pay Domeny for? A. For the ditch.

"The Court: This ditch? A. Yes, sir; that I had nothing to do whatever with.

"The Court: I understand your theory of it exactly, but, so far as the Indian was concerned and the government, it was to pay for this ditch under your brother's contract? A. Yes, sir.

"Mr. Cress: Wait a minute. Objected to as incompetent, irrelevant, and immaterial.

"The Court: Overruled.

"Mr. Cress: We except.

"The Court: That is what it was for, wasn't it? A. It was to pay for this ditch.

"The Court: That is right, to comply with this contract. A. That is what Mr. Farrell said.

"The Court: It was to comply with this contract that your brother entered into to expend $150 on that ditch? A. Your honor, I didn't know anything about the contract at the time.

"The Court: Well, but then that—did you understand it that that was what you signed it for? A. Yes, sir.

"The Court: That is it.

"Mr. Cress: That was what you signed it for? A. To get this lease.

"The Court: And in order to get the lease you had to sign your brother's note to pay this Domeny debt? A. Yes, sir."

The superintendent testified:

"Mr. Farrell, you spoke of these defendants or one of them negotiating for an additional lease on another and different allotment to the one in section 19; did you or did you not refuse to recommend the other lease applied for by R. J. Huston until the note as heretofore mentioned was left at your office? A. Yes; I refused to recommend favorably. I advised the parties that I could not recommend favorably a new lease until the terms of his old lease had been fully complied with; that, if their dispute over the ditch which had been pending when I took charge could not be settled between them, I was only able to put the matter before the department for its action. Q. 4. Mr. Farrell, state whether or not you held the lease of R. J. Huston in your office until the note in question was left at your office before the sending of the lease to Washington for approval? A. When I took charge this lease application and this controversy regarding the ditch was being held in the office. I awaited the final decision between the parties in controversy, notifying Mr. Huston that I could not recommend favorably a new lease until conditions of the old lease were complied with or the controversy decided upon between Domeny and Huston, and if they did not or could not come to a satisfactory arrangement that I would be obliged to refer the whole matter to the Indian office. * * * Q. Mr. Holmes has referred to and interrogated you about your having refused to recommend the approval of a certain new lease for R. J. Huston. I will ask you to state whether in so doing you had any personal interest in procuring the note for Mr. Domeny herein sued upon. A. None whatever; our regulations require that the terms of every lease be complied with before a new lease should be recommended for approval."

In their brief defendants say:

"It is our contention that this note was obtained illegally by duress in that Robert Huston had then pending an application which he was entitled to have considered and acted upon favorably without any other consideration, and that, if his signature to this note was obtained as the evidence shows it was, then it was obtained by duress and fraud."

The statute (Rev. Laws 1910) provides:

"900. Duress consists in:

"First. Unlawful confinement of the person of the party, or of husband or wife of such party, or of an ancestor, descendant, or adopted child of such party, husband or wife.

"Second. Unlawful detention of the property of any such person; or,

"Third, Confinement of such person, lawful in form, but fraudulently obtained, or

fraudulently made unjustly harassing or oppressive.

"901. Menace consists in a threat:

"First. Of such duress as is specified in the first and third subdivisions of the last section.

"Second. Of unlawful and violent injury to the person or property of any such person as is specified in the last section; or,

"Third. Of injury to the character of any such person."

In Piekenbrock v. Smith et al., 43 Okla. 585, 143 Pac. 675, the rule as to what constitutes duress is announced in the syllabus as follows:

"The question in each case is: Was the person so acted upon by threats of the person claiming the benefit of the contract, for the purpose of obtaining such contract, as to be bereft of that quality of mind essential to the making of a contract, and was the contract thereby obtained?"

In the body of the opinion it is said:

"In other words, the general rule is laid down in Dadich v. Hutchins et al., 95 U. S. 212, 24 L. Ed. 409: 'To constitute the coercion or duress which will be regarded as sufficient to make a payment involuntary, * * * there must be some actual or threatened exercise of power possessed * * * by the party exacting or receiving the payment over the person or property of another from which the latter has no other means of immediate relief than by making the payment. As stated by the Court of Appeals of Maryland, the doctrine established by the authorities is that "a payment is not to be regarded as compulsory unless made to emancipate the person or property from actual and existing duress imposed upon it by the party to whom the money is paid." Baltimore v. Lefferman, 4 Gill (Md.) 425, 45 Am. Dec. 145; Brumagin v. Tillinghast, 18 Cal. 265, 79 Am. Dec. 176: Mays v. Cincinnati, I Ohio St. 268.' See also, Cribb v. Sowle, 87 Mich. 340, 49 N. W. 587, 24 Am. St. Rep. 166; Briggs v. Withey et al., 24 Mich. 136. What is there said as to compulsory payments is, of course, applicable here as to a compulsory promise to pay."

In our opinion the evidence in the instant case conclusively established that defendants fully understood and appreciated the nature and purpose of the note in suit, namely, that was executed in settlement of the controversy between J. E. Huston and the officials of the Ponca agency relative to his liability for the construction of the ditch provided for in his previous lease. They discussed the matter privately, and determined between themselves that rather than have this question of disputed liability presented to the Ind'an Department for settlement J. E. Huston would acknowledge his indebtedness in the amount and according to the contention of the agency superintendent, and undertake its future payment by the note in suit executed by himself, as principal, and R. J. Huston, as surety. Under the circumstances it is manifest that they were not bereft of that quality of mind essential to the making of a valid contract.

There is nothing in the evidence that even tends to establish fraud or extortion on the part of the agency officials. At the time of the execution of the note in suit the question of payment for the construction of the ditch in accordance with the terms of his lease contract was a matter before the Ponca agency for adjustment, and the then superintendent, Farrell, was insisting upon its settlement.

It does not appear that such matter was without scope of the authority of the agency officials, and it may therefore be presumed that the superintendent in the performance of his duties was acting in the manner deemed by him to best subserve the interests under his charge. The evidence does not even raise a suspicion that he was corruptly concerned in the matter.

Defendant offered evidence to establish that H. M. Noble, superintendent of the Ponca agency, at the time of the making and approval of the lease to J. E. Huston, was thereafter discharged for misconduct or malfeasance in office. This evidence was excluded, and we think properly for the reason that the alleged misconduct was in regard to matters entirely foreign to the leases and note in question.

Upon a review of the entire evidence we are of opinion that, admitting all it tends to prove and all inferences reasonably deducible therefrom, neither failure of consideration, duress, nor fraud or corruption inducing the execution of the note in question is established. The judgment of the trial court should therefore be affirmed.

By the Court: It is so ordered.