FRANCIS *v.* HURD.[1]

1. PAYMENTS—DURESS—WHAT CONSTITUTES.

   Payment made by a mother to the owner of goods taken by the former's daughter cannot be recovered back on the ground of duress, although the owner was pressing for payment, and there was a dispute as to the value of the goods taken, where there was no threat by the owner of a prosecution of the daughter for a criminal offense, and the payment was voluntarily arranged for on one day, and the amount paid on the next after consulting a lawyer.[2]

2. SAME—FRAUD—QUESTION FOR JURY.

   But where the circumstances are such as to justify an inference of bad faith on the part of the owner, whether a recovery should be had on the ground of fraud and overreaching is a question for the jury, under proper instructions.

---

[1] Rehearing denied September 14, 1897.
[2] The effect of duress by threats to prosecute a relative is considered in a note to *City Nat. Bank* v. *Kusworm*, (Wis.) 26 L. R. A. 48.

Error to Ingham; Person, J.  Submitted February 5, 1897.  Decided May 28, 1897.

*Assumpsit* by Ann Francis against Daniel C. Hurd to recover money alleged to have been obtained by fraud and duress.  From a judgment for plaintiff, defendant brings error.  Reversed.

*Harris E. Thomas* ( *Cahill & Ostrander*, of counsel ), for appellant.

*Q. A. Smith* and *M. V. & R. A. Montgomery*, for appellee.

LONG, C. J.  This action was brought to recover the sum of $500, claimed to have been paid by plaintiff to the defendant under duress.  The declaration avers the circumstances under which the money was paid substantially as follows:

1. That the plaintiff is the mother of Ella Francis, now Mrs. Urch, a young lady about 28 years of age, who had been in the employ of defendant in his store as a clerk and saleswoman.

2. That on July 14, 1892, defendant falsely and fraudulently claimed and pretended to plaintiff that her daughter had been guilty of stealing, taking, and carrying away defendant's goods.

3. That her daughter was about to be and would be arrested on complaint of defendant for such larceny unless plaintiff paid defendant $500.

4. That plaintiff was so wrought upon and agitated by such unlawful claim and pretense that she paid the $500.

It appears that the plaintiff's daughter, at the time of the payment of the money, was a woman about 28 years of age.  She commenced work for defendant as a clerk in 1887, and had become principal clerk in the store.  Her parents lived on a farm near Lansing, and were customers of defendant, who dealt in dry goods, clothing, boots, and shoes, and had so dealt for some 18 years, in North Lansing.  When Miss Francis entered defendant's employ, there was a dressmaking establishment in the same build-

ing over defendant's store.   Defendant removed his stock
to another building, and soon after the dressmaking estab-
lishment was removed over the new location.   The dress-
making business was conducted by Miss Towne, a friend
of plaintiff's daughter, and with whom the daughter much
of the time roomed and boarded.   She was rooming and
boarding there in July, 1892.   Miss Francis commenced
work for $2.50 per week, but her pay was increased from
time to time until, in July, 1892, she was receiving $7.50
per week.

As early as 1889 defendant was told by one of the
clerks that he believed Miss Francis was taking money
from the store.   Later another clerk told him the same
thing.   Defendant then talked with Miss Francis about
it.   She denied the charge, and defendant says he then
believed the clerks were mistaken.   In May, 1892, de-
fendant overheard a lady clerk talking about the dresses
Miss Francis was having made (she was about to be mar-
ried), and that she would not need to buy any for a long
time.   Defendant claims that he thought this strange, as he
was owing her some $650 on her wages, and she seemed to
be buying nothing at the store.   On July 12, 1892, one of
the clerks said to the defendant that he could stand it
no longer, that he had seen Miss Francis taking goods
out of the store when the defendant was absent, and that
she had taken a lot of shoes that day.   On the next day
the defendant took a search warrant, and, with an officer,
went in the evening to the dressmaking rooms of Miss
Towne over the store, where they found a large quantity
of goods in packages claimed by defendant to be his.
They then went to the house of Miss Towne, where she
and Miss Francis were.   They denied that any of defend-
ant's goods were there, but, upon search being made
in the rooms, they found other goods claimed by defend-
ant.   Some of the goods found at the house were claimed
by Miss Francis, and were given up to her.   The balance
of the goods were all turned over to the defendant.   Later
Miss Francis and Miss Towne asserted title to a few of

the articles taken, and all the rest were put back into the stock of the defendant, and retained by him. The articles taken on the search warrant are too numerous to mention. They consisted of dress goods, mitts, gloves, shoes, napkins, towels, sheeting, table linen, handkerchiefs, laces, veiling, ribbons, etc., amounting at retail prices to upwards of $600.

On the trial Miss Francis was called as a witness, and acknowledged that she took these goods from the store of the defendant. The reason given by her for taking them was that she intended to return some; that she had heard Mr. Hurd was in debt, and she was in doubt about getting her pay, but when he settled with her she intended to allow him for the goods. She was asked if she had kept any account of the goods, and said she had not, only in her head. Being asked how much she figured the goods in her head, she said about $75; asked how long before that she conceived the idea of taking the goods for her pay, she said, "Some seven or eight weeks." She had been taking goods for some two years prior to this.

It appears that on the morning of July 14th the officer went to the farm of Mr. Francis, and told him about the occurrence. Both parents came to Lansing. Mr. Francis went to see defendant, and Mrs. Francis went to see her daughter at the home of Miss Towne, talked with her there, and went to defendant's store, where she found her husband and defendant in conversation. Defendant told of the goods he had found, and stated his belief that Miss Francis had been taking goods for a long time, and that he could not tell how much he had lost. There was no talk of a settlement at this interview. Plaintiff and her husband then went to see their daughter, and talked the matter over with her. They also talked with the officer and Miss Towne. They then returned to the defendant's store, and at this interview there was talk of a settlement. Plaintiff was asked, on the trial:

"How did you come to make a settlement, and what was there to it?

"*A.* Well, Mr. Francis asked him what was the least that he could settle for, and he said $2,000 and her wages, and make up B. & L. money to $500, and that was the least, and that was less than half of what he expected to get.  *  *  *  Mr. Francis said that he could pay no such sum, and that he would have to take her body,—she was out from under his reach; and he said that he would have to have her arrested, or something of that kind,—that would only take her body,—and that was the last that he said.   Mr. Francis then said, 'Come, we are going home.' But I did not go.   I stayed there, I presume, two minutes, and Mr. Hurd came up and said, 'You can settle it.' He said he would settle it for $500 and her wages.  *  *  *  I said, 'I will give it.'  *  *  *  The next day we came to town.   Mr. Francis did not go to see Mr. Hurd again.   I did, after I got the money.   I borrowed the money myself of Mr. Wilbur,—gave my note for it.  *  *  *  Then I went and got a receipt made out, and took it to Mr. Hurd, and he signed it, to the amount that he was owing Ella and the amount that I paid him.   I paid him the money.  *  *  *  The receipt was drawn at Mr. Twaits' office.   No one went with me to get the receipt drawn.   My husband did not go with me."

According to the testimony of the plaintiff and her husband, nothing was said by defendant about arresting their daughter at any time while the settlement was being made.   But plaintiff contends that, during the night when the goods were taken, the defendant was at the house of Miss Towne with the officer nearly all night, urging Miss Francis to go out to her father that night and have it settled up.   Plaintiff, however, does not claim that her daughter told her of any threat of arrest.   She had seen the goods found by Mr. Hurd.   Her daughter had told her that she had taken goods which she had neither paid for nor charged on the books, and she had talked with her daughter about making a settlement. She knew no complaint had been made, and she understood she had authority to make a settlement for her daughter, and allow Mr. Hurd to keep her wages in settlement.

It is difficult to read this record and come to any other

conclusion than that the defendant, under the circumstances shown, had reason to believe that Miss Francis had intended to steal these goods. The plaintiff, however, testified that she did not believe, either at the time of the settlement or at any other time, that her daughter had stolen. The declaration avers that the duress arose from a false and fraudulent claim that Miss Francis had been stealing, and would be arrested and prosecuted for the larceny unless settlement was made. Under the undisputed facts in this case, it is apparent that the claim made by the defendant that Miss Francis had been stealing goods was not fraudulent. He had good reason to believe, from all the facts and circumstances, that such was the case; and there is no proof of any threat to arrest or prosecute.

The fact that Mr. Hurd had good reason to believe that the goods were stolen by Miss Francis is better shown by reference to some of the articles taken, and the time when taken, as shown by the testimony introduced by defendant. There were garments of woolen underwear found, which Miss Francis says she took for her mother, which were taken in the spring, and which lay in the shop of Miss Towne for weeks. There were two infants' dresses found, which Miss Francis says were sent up to Miss Towne's room by mistake, in a box supposed to be empty. They were wrapped by Miss Towne in a package, the name of Miss Francis written on them, and thrown upon a shelf in a closet. The store where they belonged was just below. There was cottonade for clothing, which Miss Francis says she took for her father, which had lain for weeks in Miss Towne's room. There was heavy barege veiling, taken to be made up some time,—taken in the summer. There were shoes at the house of Miss Towne, which had been taken there, as claimed, to be tried on by Miss Towne, which had remained there for days; and there were four pairs of shoes found in Miss Towne's shop. In all, seven pairs of ladies' and one pair of men's shoes were recovered. Testimony

is given in the case by the clerks of defendant, whose suspicions were aroused as to the conduct of Miss Francis, and to which defendant's attention had before been called. She frequently—perhaps once in two or three weeks—got small silver changed into bills by the bookkeeper in the store. This covered a period of two or three years. She also changed silver into five and ten dollar bills at the stores of other merchants near by at different times. The testimony also shows that she carried on a traffic in goods with girls in the shop of Miss Towne, selling them and taking money for them, frequently taking goods from the store, not paying for or charging them. These things were noticed by the other clerks. When asked at the house of Miss Towne, on the night the goods were taken, if any goods were there belonging to Mr. Hurd, she denied there were any such, and yet large quantities were so found; and finally, when pressed for the reason for taking them, she asserts that she thought she would not get her pay, and she intended to account for them in a settlement with Mr. Hurd. Something over $600 worth of goods were taken. She kept the account in her head, and estimated the value at $75.

We think the admitted facts negative any duress. Duress implies a constraint which overcomes the will. While this may be brought about by threats of prosecution for a criminal offense, yet in this case we find no such threat; and the mere fact that the defendant was pressing payment of a debt which he believed to be his due can in no sense be held illegal. It was a matter of dispute as to how much the debt was,—just how much was the value of the goods the daughter had taken during those years. The plaintiff was authorized by her to make settlement. She made it after a full and fair understanding as to what she was settling for. There was no haste about it. She arranged it voluntarily one day, and paid the amount the next. She went to a lawyer, and had the receipt drawn, which fully covered the settlement. It is said that, the defendant having at-

tempted to impress upon the plaintiff the fact that Miss
Francis had confessed her guilt to him, this operated upon
the mind of plaintiff, and influenced her in making the
settlement. But the plaintiff testifies that, at the time
she made the settlement, she did not believe her daughter
was guilty of having stolen anything, or was guilty of
the crime charged. It is not apparent, from these facts,
how the plaintiff was deceived, nor how, by such decep-
tion, she was induced to make the settlement.

At the close of the testimony, defendant's counsel asked
the court to charge that plaintiff could not recover. This
was refused. While there may be some evidence in the
case which warranted the court in refusing to instruct a
verdict for the defendant, yet, under the facts shown and
the circumstances surrounding the case, we think the
court was in error in refusing certain other requests to
charge. No tribunal would have the right to disturb the
compromise and settlement, except upon evidence of fraud
or unconscionable advantage, as no threats to institute
criminal proceedings are shown; so that the real question
which should have gone to the jury was whether the
defendant was acting in good faith, and making a demand
of payment for goods and property which he actually be-
lieved he had lost. In view of this, the following requests
should have been given, or the substance of them em-
bodied in the general charge:

"5. It is admitted by Mrs. Ella Urch [Miss Francis]
that she had, from time to time before the 14th day of
July, 1892, been taking goods belonging to Mr. Hurd
from his store without paying for them, and without
charging them to herself, unknown to Mr. Hurd. Under
these circumstances, she must be held chargeable with
the reasonable suspicion arising from those facts. If Mr.
Hurd, learning of these facts from his clerks, suspected
or believed that Miss Francis was stealing goods, the fact
whether or not she intended to commit the crime of lar-
ceny is not important. In other words, Mr. Hurd had the
right to act upon the information received by him upon
this subject, and, after finding the goods in the rooms of

Miss Towne and at the house of Miss Towne, he had the right to suspect and believe that other goods had been taken under similar circumstances. He was not obliged to accept the statement of Ella Francis that she did not commit the crime of larceny, and his conduct thereafter is not to be measured or determined by the actual guilt or innocence of Miss Francis.

" 6. If the defendant claimed to the plaintiff that her daughter had been stealing goods and money from him, and the plaintiff, after hearing his statement of the facts, and her claim that she had never stolen anything from the defendant, nevertheless paid to defendant the sum of $500 in settlement of the defendant's claim, she cannot recover the money so paid.

" 7. If Ella Francis did take and carry away the goods of the defendant, intending to steal them, then the defendant did not in that regard make any false charge to the plaintiff. If plaintiff's daughter took goods of defendant, and did not in fact intend to steal them, but to some time pay for them, or have them charged to herself, she is responsible for the belief likely to be excited by her acts in this direction. And if the plaintiff, after hearing the statement of Mr. Hurd, and also that of her daughter, the claim of guilt on the one hand and of innocence on the other having been made to her, determined to pay and did pay the defendant money, she cannot recover.

" 8. If the statements made by defendant to plaintiff were such as the conduct of Ella Francis, the finding of the goods, and the information received by defendant from his clerks rendered reasonable, and plaintiff, hearing them and also hearing the story of her daughter, herself believed that her daughter might have taken goods or money not recovered, and that it was proper to pay to Mr. Hurd the sum of $500, she cannot recover, even if her daughter did not in fact intend to steal the goods.

" 9. If the daughter of plaintiff had stolen goods from defendant, or if she had taken them and not paid for them or accounted for them, but without intending to steal them, in either event defendant was entitled to be paid for goods so taken. If the circumstances were such that, whether the goods were or were not stolen, it was likely or probable that other goods than those recovered had been taken, Mr. Hurd, acting upon all the facts as they appeared, had the right to demand pay for such goods. If plaintiff, after hearing the facts or claimed

facts, both from Mr. Hurd and from her daughter, paid to the defendant the money, she cannot recover.

"10. If the jury should reach the conclusion that Ella Francis did not intend to steal the goods, that would not necessarily be decisive of the case. The plaintiff's daughter admittedly took some goods out of the store without paying for them or giving any account of them to Mr. Hurd. Under such circumstances, Mr. Hurd was not bound to take her statement as to the quantity or value of the goods so taken. He had a right to assume that others had been so taken, and to make his own estimate of them. And if the plaintiff, after talking with defendant and her daughter, consented to pay $500 in settlement of defendant's claim, she cannot recover it."

"13. The undisputed testimony in this case shows that for several years prior to the 14th day of July, 1892, Ella Francis, now Mrs. Urch, had been employed as a clerk in defendant's store at North Lansing; that, for several months just prior to July 14th, she had been taking goods out of defendant's store that did not belong to her; that she neither paid for such goods, nor gave an account of them, nor had them charged to her upon defendant's books; and that the fact that she had taken them, and the amount she had taken, was not known to Mr. Hurd until he was informed by his clerks, and the goods or some of them were found by the officer having the search warrant for that purpose. Under such circumstances, Mr. Hurd was not bound to accept Mrs. Urch's statement as to the amount or value of the goods so taken by her. He had a right to assume, for the purpose of settlement, that she had taken other goods besides those found, and to put his own estimate upon the value of such goods. And if the plaintiff, under the circumstances proved in this case, there being no evidence of duress or of constraint put upon her, saw fit to pay the sum which defendant said he was willing to accept in settlement, she cannot recover it back in this suit.

"14. If Mr. Hurd, falsely and without pretense of right, represented to Mrs. Francis that her daughter had been wrongfully taking goods out of his store, when in fact she had not been, and by such false pretense induced Mrs. Francis to pay him $500, she may sue and recover it of him in this action. But if her daughter had, as a matter of fact, been taking goods out of defendant's store that did not belong to her, and without the knowledge of Mr.

Hurd, and if he had no means of knowing the extent or value of the goods thus taken, he had a right, in case the plaintiff proposed a settlement for such goods, to put his own estimate on his loss, and the plaintiff had the right to pay it or not, as she chose; but, if she paid money under such circumstances, she cannot recover it in this suit.

"15. If plaintiff voluntarily paid defendant the money she claims to have paid, she cannot recover it in this suit, unless the defendant deceived the plaintiff, and induced her to pay the money by false and fraudulent representations as to the facts.

"16. If plaintiff's daughter had been taking goods out of the defendant's store from time to time without defendant's knowledge, under such circumstances as might reasonably lead the defendant to believe she had stolen them, and if this wrongful conduct had been going on for so long a time that defendant did not have the means of knowing the extent or value of the goods so taken, he had a right to estimate such loss at such sum as he believed would indemnify him; and any statement made by him, to the effect that his loss might be one, two, three, or six thousand dollars, if accompanied by the further statement, made in good faith, that he did not know and had no means of finding out just how much his loss was, would not, under such circumstances, be false and fraudulent. And if the plaintiff, knowing these facts, and that defendant's claim was in the nature of an estimate, and did not purport to be an accurate statement of his loss, voluntarily paid the money, she cannot recover it.

"17. The plaintiff had a right to settle with the defendant, and to pay him for any goods wrongfully taken by her daughter out of his store; and, if the exact quantity and value of the goods so taken was not known, the parties had a right to agree upon a sum that should be paid and accepted in settlement. If they did agree upon such settlement, and the money was paid in pursuance to it, it is binding upon both parties, and the plaintiff cannot recover."

The judgment must be reversed, and a new trial ordered.

MONTGOMERY, HOOKER, and MOORE, JJ., concurred with LONG, C. J.

GRANT, J. I think the court should have directed a verdict for the defendant.