# W. E. LACKS, KATIE LACKS, HENRY LACKS and JOHN N. LACKS, Appellants, v. BUTLER COUNTY BANK, WILLIAM FERGUSON and HENRY TURNER.

## Division One, May 29, 1907.

1. **DURESS: Notes for Stolen Money: Admissions of Thief: Res Gestae.** In a suit by a bank cashier to have cancelled certain notes executed by himself and others to the bank in payment of money stolen from the bank, on the ground that they were obtained by duress and threats of prosecution, evidence that a negro janitor, ten days afterwards, admitted to others that he stole money from the bank, is not competent as *res gestae.* And the fact that the janitor could not be compelled to testify if he chose to claim his privilege, does not change the rule of law as to the competency of such testimony. But all the testimony tending to show that the janitor stole the money, such as his immediate flight, the large amounts he expended soon thereafter and that were found on him when arrested, are competent.

2. ——: ——: ——: **Interest Unaccounted For.** The testimony of bank officers as to what interest should have been received by the cashier and was not credited upon the books, being matters which were not considered or mentioned at the time the cashier executed the duress note, is not competent in the suit to cancel the note.

3. ——: ——: **Chancellor's Finding.** The appellate court is not bound by the chancellor's findings, nor is the chancellor bound by the jury's findings in an equity case. But due consideration is given to the chancellor's conclusions on appeal, and it, therefore, is sometimes necessary to get his course of reasoning, if that can be done.

4. ——: ——: **Facts in Evidence: Sufficient.** The cashier went to the bank early in the morning and found the assistant cashier and the negro janitor there; the assistant cashier had opened the vault. The cashier went to the post office and on his return $1,000 was gone from the vault, and the janitor was gone. He hunted up the bank officers, and told them that either he, the assistant cashier, or the janitor had stolen the money, and that he was innocent, and he asked that the janitor be arrested. The officers did nothing to arrest the janitor, but in a day or two began to talk of prosecuting the cashier,

and threatened that unless the matter was fixed up he would be prosecuted. The cashier owed the bank $700, and had made a false entry on the books by giving a time depositor a certificate for a deposit of $1,000 and carrying the account on the books for $1,000 less. Protesting his innocence, he and his brothers, in the mercantile business, were induced, as they testify, by threats of prosecution, and by the almost crazed condition of the cashier, to execute a note and deed of trust for $3,000 to the bank. The bank officers admit that they talked of prosecution, but claim they had in mind prosecution at the instance of the cashier's bondsman, a surety company, but they did not mention that fact to him or it. They made no effort to arrest the janitor, and he was arrested in St. Louis at the instance of the cashier, and when arrested he had $137 in money, a lot of silk clothing and diamond earrings, and had just lost $100 in gambling. *Held*, first, that it can make no difference whether the threat was to prosecute directly or indirectly through the surety company; *second*, the threats and actions of the bank officials superinduced the execution of the note, and it and the securities should be cancelled.

5. **NEGLIGENCE: Bank Cashier: Open Vault.** It was not negligence for the cashier to leave the bank with the vault open and to go to the postoffice, when the assistant cashier, who had opened the vault, was present in the bank when he left.

Appeal from Butler Circuit Court.—*Hon. J. L. Fort,* Judge.

REVERSED AND REMANDED (*with directions*).

*J. M. Atkinson* for appellants.

(1) The court should have entered its decree cancelling the note, deed of trust and chattel mortgage as the evidence clearly shows the same to have been obtained by reason of the threatened criminal prosecution by the directors and officials of respondent bank, of William E. Lacks, on the charge that he had embezzled the one thousand dollars which was stolen on the morning of the 10th day of July, 1902, by the negro janitor, from respondent bank. Hensinger v. Dyer, 147 Mo. 226; Bell v. Campbell, 123 Mo. 16; Earle v.

Norfolk, etc., 36 N. J. Eq. 132. (2) (a) The court erred in permitting witness Edward L. Abbington to testify over the objections and exceptions of appellants as to a "theoretical" shortage he claimed to exist in the respondent bank at the date appellant William E. Lacks was discharged. Such testimony was only offered for the purpose of prejudicing the minds of the jurors and the court against appellants. (b) The court further erred in permitting witness M. G. Cook to testify as to a supposed shortage in the earnings of respondent bank, over the objections and exceptions of appellants. Such testimony was only offered for the purpose of prejudicing the minds of the jurors and the court against appellants. Such testimony did not disprove the fact that the execution of the note, deed of trust and chattel mortgage was obtained through fear of a prosecution of said William E. Lacks by the officers and directors of the respondent bank on the charge of embezzling said one thousand dollars. (3) The court further erred in refusing to permit appellants to prove by witness James H. Smith that the negro janitor admitted to said Smith, when arrested in St. Louis, that he had stolen the said one thousand dollars. While such testimony was hearsay, yet the fact that Bollinger had stolen the one thousand dollars and had admitted that fact to be true to said witness Smith, and for which sum appellants had been required to execute their note, deed of trust and chattel mortgage, such admission constituted a part of the *res gestae* and was competent to have been proven by said witness, although made by a third person and not a party to the suit. Greenleaf on Ev. (15 Ed.), sec. 108; 24 Am. and Eng. Ency. of Law (2 Ed.), 666; Foster v. Nowlin, 4 Mo. 18; Turner v. Belden, 9 Mo. 797; State v. Schneider, 35 Mo. 533; Thomas v. Wheeler, 47 Mo. 363; Burgert v. Borchert, 59 Mo. 80; Redmon v. Railroad, 185 Mo. 1. (4) The court further erred in not

granting an accounting and giving appellants credits on their note for the sum of four hundred dollars, which was shown to either have been stolen or a clerical mistake on the books of respondent bank; the sum of five hundred dollars which was burglarized and of which respondent bank had full notice; the sum of one hundred dollars, the same being the loss to the bank on the forged note purported to have been signed by H. H. Hart and L. F. Nickey; the sum of one thousand dollars stolen by the negro janitor, Bollinger, on the morning of July 10, 1902; and the further sum of three hundred dollars which was included in said three thousand dollar note without consideration, all of which was shown by the evidence to have been included in said three thousand dollar note and which items were without any consideration on the part of appellants, and to that amount the consideration in said note wholly failed. R. S. 1899, sec. 776; Woodard v. Martin, 106 Mo. 362; St. Louis v. Crow, 171 Mo. 279; State ex rel. v. Dearing, 180 Mo. 63; Biddle v. Ramsey, 52 Mo. 158; Crosby v. Bank, 107 Mo. 442; Liese v. Meyer, 143 Mo. 555; Dickey v. Life Assn., 82 Mo. App. 376.

*L. F. Dinning* and *L. R. Thomason* for respondents.

(1) The court committed no error in the trial of this cause. Its judgment is for the right party and is supported by the greater weight of the testimony taken upon the trial thereof. (2) We do not question that the law of duress is correctly stated by this court in the case of Hensinger v. Dyer, 147 Mo. 219, but aver that the testimony adduced upon the trial of the case at bar does not establish the fact that the note and mortgages were signed under duress. (3) So far as the issues made by the pleadings in this cause are concerned, the declarations of Bollinger sought to be introduced were nothing but a narrative of past events, were

not *res gestae,* and not admissible.   Black's Law Dic., p. 1068; Redmon v. Railroad, 185 Mo. 11.   (4)   The proposition contained in the fourth clause of appellants' brief is in our opinion incorrect; in fact, we challenge the production of a single authority that supports the position therein taken, viz., that upon a bill in equity to cancel a note and mortgage executed to secure the payment thereof, because the same was executed under duress, a court of equity has jurisdiction to go behind the execution of the note and mortgage and have an accounting between the parties or to grant any relief not consistent with the averments of the petition or the proof in support thereof.   Liese v. Meyer, 143 Mo. 555.   Appellants will not be permitted to try the cause upon a theory wholly different from the one upon which they tried the cause in the circuit court.   The instructions asked by appellants and the proof introduced establish that they tried the cause upon the theory of cancellation upon the ground of duress.

GRAVES, J.—Plaintiffs brought suit in the circuit court of Butler county, to cancel a promissory note for three thousand dollars, as well as a deed of trust and chattel mortgage given to secure the same, on the ground that they were procured by duress.   From a decree dismissing their bill, they appealed.

Defendant Butler County Bank is a banking corporation under the laws of this State.   Defendant Henry Turner is the trustee in the deed of trust and chattel mortgage, and defendant William Ferguson the beneficiary therein, but as trustee for the defendant bank, as stated in the petition.   Plaintiff Katie Lacks is the wife of the principal plaintiff, W. E. Lacks, and signed the written instruments with him.   The other plaintiffs are brothers, who signed the note as sureties.

W. E. Lacks had for some years been the cashier

of defendant bank. Prior to July 10, 1902, the date around which clusters the story of this case, W. E. Lacks owed the bank upon notes and overdrawn account in the aggregate sum of seven hundred dollars, unsecured as far as the record shows. On July 16, 1902, said W. E. Lacks and the other plaintiffs executed the instruments involved in this suit. A day or two after that his resignation as cashier was requested and by him given. W. E. Lacks claims that on or about July 10 he went to the bank in the morning; that Mr. Cook, the assistant cashier, was there and opened the safe and cashed a check for some one; that one William Bollinger, a gentleman of color, and janitor of the building, was there sweeping out the bank; that he, Lacks, went to the postoffice for the mail; that they were found short one thousand dollars in cash, which must have been taken out at that time; that he at once reported it to the president of the bank, stating that one of three persons must have gotten the money, viz., Cook, himself, or the negro; that he knew he did not get it, and did not think Cook got it, but believed the negro did, inasmuch as he had gone, and suggested that they take steps to have him apprehended; that the officers of the bank declined to take such steps, saying that they did not want the notoriety of a loss of this character; that in a day or two thereafter the officers began to threaten him with prosecution for the theft of this money and he then on his own account began a search for Bollinger, the negro janitor, but did not succeed in having him arrested until after the officers of the bank, through these threats but against his protests of innocence and liability, procured the execution of these papers. It also appears from the petition and the evidence of this witness, that prior to this time, he, the cashier, had cashed a note, paying therefor one hundred dollars, which note turned out to be a forgery, and this sum was charged to him in the note of three

thousand dollars in suit. That in 1900, while one Turner was assistant cashier and he was cashier, five hundred dollars was stolen from the bank without fault upon his part, and this was included; that at another time prior to July 10, 1902, the bank was burglarized and four hundred dollars in silver taken therefrom without fault upon his part; that on July 15, 1902, one of the bank customers, Chester A. Detrich, overdrew his account in the sum of seventy-seven dollars, which was likewise wrongfully charged to the witness in the three thousand dollar note. The petition sets out fully and particularly all these matters, as well as the fact that the officers of the bank threatened W. E. Lacks with prosecution if the note and other instruments were not executed, and that by reason of said threats they were executed by W. E. Lacks, and the other parties thereto. The petition, after pleading in detail all these transactions and averring that none of the losses of the bank were through the knowledge, consent, fault, negligence or wrongdoing of W. E. Lacks, closes with this prayer:

"Wherefore, the premises considered, the plaintiffs pray that the said note, the said deed of trust, and the said chattel mortgage be canceled and held for naught and for such other and further relief as to the court may seem meet and just in the premises."

The answer of the bank admits the corporate capacity of the defendant bank and denies generally all other things pleaded in the petition. The record before us shows no answer as to the other defendants. The judgment after making the formal recitations, closes thus:

"And being fully advised of and concerning said evidence, doth find the issues herein for the defendant, the Butler County Bank.

"Wherefore it is ordered and adjudged by the court that plaintiffs' bill be, and the same is hereby

dismissed. It is further ordered and adjudged that plaintiffs take nothing by reason of said bill and that defendants go hence thereof, without day.

"It is further ordered and adjudged by the court that defendants recover of and from the plaintiffs their costs in this behalf expended and that execution issue therefor."

In addition to the testimony of W. E. Lacks as to the threats of prosecution, Henry Lacks, one of the plaintiffs, testified in part thus:

"Q. I will ask you to state to the jury now why you signed that note for three thousand dollars? A. Through threats that was made of a criminal prosecution of my brother—he was just about crazed at the time, and I was very uneasy about him—he was just as near crazed as you ever see a man.

"Q. You say you signed it on account of threats being made to prosecute him through these shortages, and you did not know then how these shortages came about—you say that you signed that note because of threats to prosecute him? A. Yes, sir.

"Q. Who made any threats, Mr. Lacks? A. The bank officials.

"Q. Who was it? A. It was general talk among them.

"Mr. DINNING: Give us names.

"A. Jesse Reynolds and George Begley were two of the men.

"Q. What did they say with reference to prosecuting Will E. Lacks? A. George Begley said that W. E. Lacks had stole the money, that is, that one thousand dollars, and that that matter had to be fixed up, and Jesse Reynolds was agreeing in what Begley said—they said the matter had to be fixed up.

"Q. They said that matter had to be fixed up immediately? A. Well, at that time, I do not know that they said immediately.

"Q. Were they negotiating with you at that time to sign that note? A. Yes, sir.

"Q. Where were you when this conversation occurred? A. It occurred in the back of the office of Jesse Reynolds.

"Q. He, at that time, you say, was president of the Butler County Bank? A. Yes, sir.

"Q. Who else was present besides George Begley and Jesse Reynolds at the time this conversation occurred? A. I do not remember of any one else at that time. Myself and those two men.

"Q. Was the note signed by you at that time? A. No, sir; the note was not signed until perhaps two days after that.

"Q. Well, what did you say when George Begley said that Will Lacks had stolen that money, and the matter had to be fixed up? A. I said, 'Gentlemen, I am satisfied as well as I am of anything that Will Lacks never got one cent of this money, but he is crazed over the matter, and you gentlemen have no way on earth of knowing anything else but that he did get it; but I believe that right will come out sometime, and that you gentlemen will know that he never got the money; but I am, at present, willing to fix it up in order to relieve his mind.'

"Q. Why did you sign that note? A. To keep them from prosecuting Will Lacks.

"Q. Were you present when Will Lacks signed it? A. I am not sure, I suppose I was.

"Q. Were you present when your brother, John N. Lacks, signed it; were you together when the note was signed. A. Yes, sir; I think so.

"Q. Where was it signed? A. Down in the office at the bank.

"Q. Who was present of the bank officials, if any one? A. I think they were all present—I remember

that Mr. William Ferguson was present, and Mr. Ed. Abington, and Mr. Jesse Reynolds — I am not sure about Begley; and John N. Lacks, W. E. Lacks and myself; and there may have been others.

"Q. At the time of signing this note, you say this was about two days after you had the conversation with Reynolds and Begley at Reynolds's office? A. Yes, sir; I think it was about two days.

"Q. At that time was there any conversation about the prosecution of Will Lacks, unless this note was signed up, down at the bank at the time you signed it? A. It was the general talk, but I do not recollect any words used at the time we signed it; the reason we made the note was for that purpose.

"Q. The whole talk and conversation had been prior to that, and you had all come to the point where you were going to sign the note? A. Yes, sir.

"Q. Did Will Lacks refuse to sign this note in the presence of any of the bank officials, and in your presence? A. Yes, sir. Will Lacks did not want to sign it at all, and did not want me and my brother to sign it; that he would abide by the consequences; but we agreed to help him out. I think W. E. Lacks said in the back office over Mr. Cameron's store to Col. Phillips, and I believe Mr. Sam Phillips was present and myself."

And on cross-examination, among other things, he said:

"Q. Now, Mr. Lacks, you say that Mr. Begley said that Will Lacks had stolen the money? A. Yes, sir; I said that.

"Q. Did he intimate for a second that he intended to have him prosecuted for this criminally? A. Yes, sir; he did.

"Q. What did he say? A. He said, 'Will Lacks stole the money and he would be prosecuted unless the matter was fixed up.'"

And further on the same witness said:

"Q. You say that George Begley said that he had stolen it, and that he would prosecute him if he didn't fix it up? A. Yes, sir.

"Q. Now, what did Jesse Reynolds say about it? A. I don't remember that Jesse used — he concurred in the expressions.

"Q. Now, what did he say? A. I don't remember.

"Q. I want to know and the jury want to know, now, just what he said? A. He heard the conversation, to say the least of it, and he never objected to it.

"Q. That is the reason you think he was agreeing in what Begley said — did you object? A. I will tell you something, I did —

"Q. I am not asking you that — I want to know if you objected at the time. A. I told them that I knew W. E. Lacks never got one cent of the money, but they wasn't satisfied at the time, and we had no means of knowing; and I said: 'Gentlemen, sometime you will find out to your satisfaction that W. E. Lacks never got a cent of this money, but under the pressure brought to bear at present, we will fix it up.'

"Q. I will ask you if you would have signed that note at all — this three-thousand-dollar note — except for the threats made of prosecuting Will Lacks? . . . A. I undoubtedly would not have signed that note except for the threats."

John N. Lacks, one of the plaintiffs, testified, among other things, as follows:

"Q. Where were you when you signed that three-thousand-dollar note? A. At the Butler County Bank.

"Q. Who was present? A. Will Ferguson, Jesse Reynolds, Ed. Abington, Henry Lacks, myself and Will Lacks — that is all I remember.

204 Sup—30

"Q. Was Katy Lacks present at the time the note was signed? A. No, sir.

"Q. What was the conversation between the bank officials and you folks leading up to the signing of this note, if you remember? A. Well, I did not talk much about it — I did not say much about it; they talked among themselves, and the talk was, if it was not straightened up, he would be prosecuted — they found about two thousand seven hundred dollars deficiency— the amount they held him accountable for was two thousand seven hundred dollars, and they made the remark they did not know whether or not it was all, and they wanted him to agree to make it three thousand dollars to cover all; and we agreed to sign the three-thousand-dollar note.

"Q. If it had not been for the threatened prosecution of your brother, Will Lacks, and the threatening demeanor of the bank officials, would you have signed that note? A. No, sir.

"Q. Answer the question. A. No, sir; I would not have done it."

By James H. Smith, then secretary for R. C. Kerens, but formerly assistant chief of detectives in St. Louis, it was shown that on request of W. E. Lacks, he had caused the apprehension of Willis Bollinger, colored, on charge of stealing money from the Butler County Bank; that they found that just previous to his arrest he had been shooting craps (faithful to predilections of the race) in Will Ray's saloon on Market and Nineteenth streets, where he had just lost one hundred dollars; that he had been riding in carriages with a colored woman and generally going a pretty fast gait; that when he was arrested, he, the witness, stripped him and found one hundred and thirty five dollars or one hundred and thirty-seven dollars in cash on his person, a lot of silk clothes, silk stockings, diamond

earrings, and a pair of high heeled shoes, that he had bought for the negro woman. At this point, the following occurred:

"Q. Further than that you don't know how much money he had spent in St. Louis, only what he told you? A. No, sir; only what he told me, and how he got it.

"Q. I will ask you if he stated to you that he got that money, together with the other amount he spent, out of the Butler County Bank while he was porter there?

"Mr. DINNING: We object to that if the court please, because it is calling for hearsay, incompetent and improper testimony, and is not admissible.

"The COURT: Objection sustained.

"Mr. RANEY: We except."

We set this out for the reason that a point is made as to the ruling of the court.

The witness further testified that the rings were worth seventy-five dollars.

The verbatim statement of Will E. Lacks, as to the threats and his reason for signing the papers, follows:

"Q. Well, what was done before? A. Well, along about the 10th I missed the one thousand dollars.

"Q. Did you report it? A. Yes, sir.

"Q. To whom? A. To Mr. Reynolds, the first one, the president of the bank — I told him there was one thousand dollars short out of the cash, and I told him there was one of three things, that either I had it, or the assistant cashier, or Willis Bollinger, and I told him I knew I did not have it, and that Willis Bollinger had gone to St. Louis, and that I wanted to send a message to Mr. Smith to look him up, and see if he could find the money on him, and so we talked around, and Mr. Abington and Mr. Reynolds and Mr. Begley

refused to let me do it, stating that they did not want it to get out here, and it went along for several days until they began to threaten me —

"Q. Threaten you with what? A. With a prosecution —

"Q. For what? A. Getting this money, and so I went and wrote the letter myself to Smith without their knowledge to see if I could find him.

"Q. With the results that Mr. Smith stated awhile ago with reference to Bollinger? A. Yes, sir.

"Q. What else was done next? A. Well, the first I knew, Mr. Reynolds had gone— I learned afterwards —had gone to Mr. Thomason, a lawyer here, and prepared some papers to be executed for this one thousand dollars and a forged note and four hundred dollars burglarized out of the bank and five hundred dollars that Mr. Turner and I missed at one time and could never account for, and my notes, which amounted —which all amounted to something like two thousand seven hundred dollars.

"Q. How much were your notes? A. About seven hundred dollars — one hundred and fifty-four dollars, two hundred and thirty-five dollars and two hundred and ninety-five dollars; together with those notes, and these other items they built on, I had to execute a note with Henry and John as security.

"Q. What did they tell you would happen, if you did not, if anything? A. They said they would have to prosecute me for the one thousand dollars shortage.

"Q. Who told you that? A. They all told me— Mr. Ferguson told me two or three times, they were talking of prosecuting me and were going to on two or three different occasions.

"Q. Mr. Ferguson was one of the directors? A. Yes, sir, and Mr. Abington came and told me some-

thing, that Mr. Begley said I got it, and that I had to fix it up. . . .

"Q. I will ask you whether or not your brothers, John and Henry Lacks, knew of these fellows threatening to prosecute you for this amount of money, if you did not make this note? A. Yes, sir, they both knew it. . . . .

"Q. I will ask you if you would have signed the note at all, except on account of their threats of prosecuting you. A. No, sir, I would not."

William Ferguson, one of the defendants, placed on the stand by plaintiffs, in his examination in chief, made the following admission:

"Q. You say you never heard of any of these bank officials talking about prosecuting him? A. Incidentally it was mentioned, of course; I was only at about one meeting after this thing took place.

"Q. Did you tell Will Lacks so? A. Yes, sir; I told him he was liable to be prosecuted.

"Q. Didn't you tell him that Mr. Begley and these people were talking about prosecuting him? A. Yes, sir; that he was liable to be prosecuted."

On cross-examination, counsel for the defendant succeeded in getting the witness to say:

"Q. Did any member of that bank directly or indirectly say that they, as officials, would prosecute Will Lacks for the shortage? A. I believe the general impression of the directors was that the Surety Company would prosecute him."

And further the testimony of this witness is as follows:

"Redirect examination by Mr. Raney:

"Q. In the conversation you had with Mr. Lacks, in which he stated he was anxious to get it settled up, I will ask you if it wasn't in the same conversation, that he told you he did not take a dollar of the money,

and that time would dig it up and show where the money went? A. Yes, sir; he told me that.

"Q. Did you not tell Will Lacks down there on the sidewalk of Ben Howlett's saloon, that all he could do was to fix it up to keep those fellows from prosecuting him? A. I do not know in what words I put it in, whatever I had to say to him was along those lines, that it would keep him from being prosecuted.

"Re-cross-examination by Mr. Dinning:

"Q. Being prosecuted by the bond company, and not by the bank? A. I never had anything in my mind, except the surety company — I never said that in words.

"Q. You never intended to convey the idea or the impression that the directors were going to prosecute him. A. No, sir; I never had the bank directors in my mind.

"Redirect examination by Mr. Raney:

"Q. You had not talked about the bond company prosecuting him? A. No, sir.

"Q. You were talking about him being prosecuted and that was all? A. Yes, sir.

"Q. Didn't you say in that conversation that it .was all you could do to keep Begley down, from prosecuting him? A. I told him .that Mr. Begley, among others, was pushing for a settlement, and that it was best for him to do it."

This witness was the payee in the note and beneficiary in the deed of trust and chattel mortgage, and testifies that he was acting for the bank in taking the papers in his name, and held them for the bank.

It might be well to note here that on the cross-examination of Henry Lacks, the defendants succeeded in bringing out the following:

"Q. Now, Mr. Lacks, is it not a fact that you were there trying to get this shortage fixed up with a note

to prevent the company that went on Will Lack's bond from finding it out; is not that true? A. No, sir.

"Q. You knew there was a bond, and that it was signed by a company that did not live here, did you not? A. Yes, sir; I knew there was a bond—a man in that position always gives bond.

"Q. Now then, when was it dated, that you signed that note? A. I think it was in July, 1902.

"Q. Then you said awhile ago, that there was seven hundred dollars of that note was owed by Mr. Lacks? A. Yes, sir.

"Q. And one thousand dollars stolen by Willis Bollinger; you said you heard Bollinger admit that, where did he admit that? A. He admitted it in court.

"Q. Do you know why it was that he came into court and pleaded guilty to that? A. No, sir.

"Q. Do you know what the arrangements were between the attorneys? A. No, sir.

"Q. You know as a matter of fact he was not to go to the pen, if the thing worked? A. No, sir."

Just what is meant by this is hard to determine, for it appears from another witness in behalf of the defendant, Ed. L. Abington, that Bollinger, at the time of this hearing, had not been tried. It was stated in argument that he was in the penitentiary for this crime, but this is not in the record. This is substantially the case of the plaintiffs.

For defendants, it was shown by Jesse Reynolds, George Begley and Edward L. Abington, directors and officers of defendant bank, that they did not threaten a prosecution of Will E. Lacks, if he did not have the papers in suit executed; that they were opposed to taking the note at the time it was given, because they were not certain what the shortage would be; that Henry Lacks insisted upon having it closed and settled at that time because it was worrying his brother Will, and they did not want the matter reported to the surety

company, which had made the bond for Will E. Lacks, as cashier. These witnesses denied specifically the threats and conversations detailed by plantiffs' witnesses. The witness Begley admitted that he stated at the previous trial of this case that he thought Will E. Lacks stole the money (the $1,000), and further admitted that he might have told others that he so thought, but stoutly denied that he had any idea of prosecuting.

On cross-examinaton, the witness Abington made this statement as to what talk was had among the directors and officers of the bank:

"Q. You say you never talked about prosecuting Will Lacks. A. No, sir.

"Q. And you never heard such conversation? A. All I heard was a conversation about notifying the surety company—and of course they knew what that would mean, they seemed to from the way they were acting——

"Mr. Dinning: Who do you mean by they? A. The Lackses.

"Q. You were talking about the surety company—notifying it? A. Yes, sir.

"Q. Did you see Will Ferguson in there any time the talk was going on about Will Lacks and this shortage? A. I don't believe I did.

"Q. He was one of the directors at the time? A. Yes, sir.

"Q. You don't know whether or not he heard you people talking about prosecuting Will Lacks? A. No, sir, he never heard us say that—he said on the stand awhile ago that he never heard us.

"Q. You heard him say that he told Will Lacks down by Ben Howlett's saloon, that they were going to prosecute him, if they didn't—if he didn't straighten this up? A. That the surety company would prosecute him—that is what they were talking about."

Defendants also introduced the original petition,

which in substance pleads all the facts as the petition upon which the case was tried, except that there is an allegation stating that, after the note in suit was given due in twelve months, at the request of the bank officers he executed a note for a like amount due in three months, which was to be in payment of the twelve months' note; that he gave this second note because the officers said that the State Bank Examiner would not permit them to carry the twelve months' note as a part of the assets of the bank. The prayer was to have said twelve months' note, the note here in dispute, canceled, and for further relief. This petition pleads the duress and all attending circumstances as fully as the petition constituting a part of the record proper, and practically in the same language.

It was also shown by defendants, and practically admitted by plaintiffs, that Will E. Lacks had been carrying the items of five hundred dollars, four hundred dollars and one hundred dollars hereinabove set out, by a false entry on the books, or rather he made the books show one thousand dollars more cash than there actually was in the bank. This was done by giving a depositor (as we take it a time depositor) a certificate for the full deposit, but carrying the account on the books for one thousand dollars less.

Over the objections of the plaintiffs, the defendants were permitted to show by one M. G. Cook, the then cashier of the Butler County Bank, that he had examined the books, and that the books showed an average of ninety thousand dollars of cash loaned by the bank for the last year of Lacks' administration, which would make, at eight per cent, the interest earned seven thousand, two hundred dollars, and that the earnings turned in were only four thousand, four hundred dollars. Over proper objection the witness was likewise permitted to testify to an alleged deposit of one hun-

dred and ninety-seven dollars made the last day Mr. Lacks was in the bank, and that the books did not show it.

On this question in the examination of Mr. Abington the following appears:

"Q. Now, Mr. Abington, have you looked over and examined the books of the bank thoroughly to see what they show? . A. Well, I have made a thorough examination—I am not an expert book-keeper.

"Q. Mr. Lacks kept the books? A. Yes, sir.

"Q. What do these books show the shortage to be?

"Mr. RANEY: We object to that, if the court please, as irrelevant, immaterial and incompetent, and because he has not shown himself to be an expert book-keeper—he has not qualified himself.

"The COURT: Answer the question.

"Q. Mr. RANEY: We except.

"Q. How much? A. About six thousand, two hundred dollars.

"Q. That was while he was cashier? A. Yes, sir.

"Cross-examination by Mr. Raney:

"Q. In that you included this loaning of ninety thousand dollars at eight per cent to amount up to what was short. A. Yes, sir.

"Q. That is part you counted? A. Yes, sir."

Defendants also introduced clause five of Lacks' cashier's bond, which provided that notice must be given by the bank of any default within so many days. This bond appears to be lost and the exact wording of the clause offered in evidence is not given.

Will E. Lacks, in rebuttal, testified that if he had the books he could show every cent of interest earned, that the net amount earned was properly kept on the books; that certain notes of the directors and some of their kinsmen, included in the ninety thousand dollars mentioned by witness Cook, were carried without in-

terest and certain other notes of the St. Francis Lumber Company, also carried in the ninety thousand dollars, were forgeries and no interest was collected; that the bank carried the county money and paid for the use thereof $1,335.26, which money was loaned and included in the ninety thousand dollars, and instead of charging on the books the full amount of interest earned and charging this $1,334.26 to expenses, he deducted it from the gross amount of interest collected, entered the remainder as the interest collected and made no charge of the $1,334.26 in the expense account.

This sufficiently states the evidence.

The court submitted to the jury the question as to whether or not the written instruments were procured by duress. The jury failed to agree, seven answering that they were not so procured and five that they were. Such is the record of this case.

I.  It is urged that the trial court erred in refusing to allow witness Smith to testify that Willis Bollinger had admitted to him that he, Bollinger, had stolen the one thousand dollars from the bank. All proper evidence tending to show that Bollinger had in fact stolen the money was admissible upon the theory, if upon no other, that it tended to show whether or not the instruments sought to be canceled were voluntary acts, or were superinduced by threats, and thereby the product of duress, rather than the free will of the parties. Proof of that fact would be a circumstance, and a strong circumstance, tending to show duress. We can readily see that if Will E. Lacks knew that he himself got this one thousand dollars, he would in all probability execute the instruments voluntarily and without threats, but on the other hand, if he was conscious of no wrong, and fully believed that Bollinger or some other party got the money, it might be that he would not so willingly execute and deliver the note and deed of trust and the chattel mortgage. Such proof tends

to show the surroundings and conditions at the time as to the commission of a crime upon his part from which an inference may be drawn as to whether or not the papers were voluntary acts. So that the evidence of the flight of Bollinger and the money and property in his hands when arrested, as well as the competent portion of the testimony as to what money he expended in St. Louis, was proper, as tending to show Bollinger's guilt, and as tending to show that Lacks did not get the money, and would not voluntarily be paying it back, or securing its payment. The evidence all shows that this one thousand dollars went into the makeup of the instruments sought to be canceled. However, this evidence went in without objection, so that defendants in effect concede its competency. But could plaintiffs go further and want to prove the statements of Bollinger some ten days afterwards? Plaintiffs urge the testimony upon the ground that it constitutes a part of the *res gestae.* In our judgment the admission upon that theory would be doing violence to the reasonably well-settled doctrine of *res gestae.* To our minds it would be hearsay, pure and simple. Bollinger was a competent witness upon the question, and the mere fact that he could not be compelled to testify if he chose to claim his privilege, does not change the theory of the law as to the character of this testimony. We see no error in the exclusion of this testimony. The cases cited by counsel for plaintiffs do not sustain their contention upon this point.

II.    All of the testimony of Cook and Abington as to what interest should have been received by the bank and was not credited upon the books, was incompetent under the circumstances of this case. These matters did not enter into consideration at the execution of the $3,000 note. They were not mentioned by either party. They were considered by neither party when the instruments were executed. So far as the evidence shows,

they were not thought of by either party at that time. It may be that if these items had been discussed at that time, then proof of them might tend to prove that Will Lacks recognized this shortage and an inference drawn from it all that the execution so far as he was concerned was voluntary. But at this time we do not go as far as to so hold. It would certainly not affect the other plaintiffs. Under the record herein this evidence was erroneously admitted. On application of the plaintiffs the court gave the following instruction to the jury, which withdrew all of this evidence:

"The court instructs the jury that it is immaterial to the issues in this case whether or not William E. Lacks owed the defendant bank three thousand dollars, or any other sum; and it is also immaterial whether or not Lacks was short in his accounts with said bank and whether or not he was guilty of the crime of embezzling the bank's funds, and in passing upon this case you will not take into consideration evidence as to the above facts."

What effect this instruction and this erroneous evidence had in procuring a hung jury we cannot say, nor can we say what influence was brought to bear upon the court by the fact that seven jurors gave their opinions to the court to the effect that the note was not signed under duress and five jurors their opinion that it was signed under duress. The record recites that they so expressed themselves, and presumably it was done under the direction of the court. It was charged in the argument that the trial court stated that he would follow the seven or majority of the jury, but we fail to find that in the record. The inference might be drawn that the judgment of the seven aided the court in determining a close question of fact. However, chancellors are not bound by even unanimous verdicts and the presumption is that this judgment is the independent judgment of the chancellor.

This instruction in our judgment is wrong, but as the error was invited by the plaintiffs, we do not know that they can complain. Nor in a case of this character is the error very material. The question for the jury was whether the execution of these papers was the voluntary acts of the parties, or were superinduced by a species of duress, i. e., threats of prosecution. Of course, if no threats were made there was no duress and that would end the case. But even if threats were made, they might not have been the superinducing cause of the execution of the note and securities, and further what items and the character thereof, whether disputed or otherwise, were very material in tending to show whether or not these written instruments in suit were voluntarily executed. If the items were admitted liabilities, it would be more reasonable to draw the inference that the acts were voluntary rather than under duress, and *vice versa.* We mention this, not that it seriously affects the merits of this, and equity case, but as tending to show the bent of the chancellor's mind, in the final judgment given by the court. For while we are not bound by the conclusions of a trial court in an equity case, due consideration is given thereto, and it thus becomes necessary to get his course of reasoning, if it can be done.

III. This is peculiarly a case of facts rather than of law. The law of this case is succinctly stated by BURGESS, J., in the case of Hensinger v. Dyer, 147 Mo. l. c. 226: ''Duress may be said to exist when one person is, by threats of a criminal prosecution of such a character as to deprive him of his own free will and agency, induced to make a contract or perform some act that he would not otherwise make or perform. And if Dyer reasonably believed that M. H. Hensinger had committed the crime of embezzlement, and by threats of prosecution and imprisonment for the crime, overcame the will of plaintiffs and induced them to exe-

cute the note and deed of trust, and they would not have executed them voluntarily, then they were obtained by duress.''

Counsel seem to concede the law and further citations would be superfluous. The question then is, do the facts sustain the judgment of the lower court? Being an equity case, we can sift the relevant from the irrelevant, the competent from the incompetent, the wheat from the chaff, and pass judgment here. [Waddington v. Lane, 202 Mo. 387.] This case does not strike us as it did the judge *nisi*. We are thoroughly impressed from the record that Bollinger got this one thousand dollars. If he did, Will E. Lacks was conscious of his own innocence, and non-liability therefor. All of the evidence, even from the defendants, shows that he protested his innocence. Nor can it be said to be negligence for a cashier to leave a bank with the vault open, to go to the postoffice, when the assistant cashier, who had evidently, under this evidence, opened the vault, was present in the bank when he left. Neither can we say that there was sufficient evidence of civil liability on the three items making another thousand of this note, save and except by the act of carrying it upon the books as he did. The plaintiffs all testify to threats. Ferguson, a defendant, admits threats, but says that he had in mind the surety company when he said that Lacks had better fix it up or that he would be prosecuted. The surety company was not mentioned. Begley's testimony was not all it should be to justify the defendants' position in the case. He admits that he desired and requested that they notify the surety company, and Abington says, ''They (the Lackses) knew what that meant.'' Abington heard the directors discuss the matter of notifying the company. It can make no difference whether the threat was for the bank officials to directly prosecute or indirectly prosecute through the agency of the surety company. They ad-

mit that they made no effort to get the negro, although he had immediately changed his place of abode, and, as later developed, there was no doubt of his manner of living. From an humble janitor in a country town he became a colored "swell" in a metropolitan city, with carriages, lady loves, diamonds, silks and cash. Lacks protesting his innocence and urging that the negro be arrested, that he might establish it, is met with no response in his call for assistance in overtaking and bringing back this janitor. Lacks was no doubt conscious of his wrong-doing in the one false entry upon his books, and this action of the directors in failing to make an effort to arrest Bollinger, could but impress him with the idea that they thought him guilty. One of the directors, Begley, so stated and does not deny his statements. Following all this are the threats and significant innuendoes of prosecution. The negro is gone, and the assistant cashier no doubt proclaiming his innocence. Lacks, a young man of family, with two brothers in the mercantile business. Did these threats and these actions of the bank officials superinduce the execution of these papers? We are inclined to think so. We think the weight of the evidence and the facts and circumstances in evidence so shows. In our way of looking at these facts the judgment is for the wrong party and the cause will be reversed and remanded with directions to enter judgment for the plaintiffs in accordance with the prayer of their petition.

All concur.