CASSIUS N. ROLOSON, Appellant, v. DeHART & RIGGS, Respondents.

### Kansas City Court of Appeals, December 7, 1908.

1. **CONTRACTS: Duress: Threats: Punishment.**   Duress implies a restraint which overcomes the will and may be brought about by threats of criminal prosecution; but where no threats are used to induce a party to execute papers, the fact that the motive for making settlement was the fear of punishment will not vitiate such condition.

2. ——:  ——.   A security will not be set aside on the ground of duress and the arbitrary manner in which the amount was fixed where the evidence shows that the complaining party willingly acceded to the basis of settlement.

3. ——:  ——: **Evidence: Physical Condition.**  *Held*, there is a failure of evidence to show that undue advantage was taken of the complaining party when he was mentally incapable of knowing and asserting his rights by reason of his physical condition.

Appeal from DeKalb Circuit Court.—*Hon. Alonzo D. Burnes,* Judge.

AFFIRMED.

*A. G. Knight, Boyd Dudley* and *J. A. Selby* for appellants.

(1)  A note given to secure the suppression, concealment of crime or dismissal of a criminal prosecution, whether the agreement be expressed or implied, is void and this although made for the amount of money embezzled.  Summers v. Summers, 54 Mo. 343; Sprague v. Rooney, 104 Mo. 358; Fire Brick Co. v. Cook, 44 Mo. 36; Baker v. Farris, 61 Mo. 389; McCoy v. Green, 83 Mo. 632; Janis v. Rocntgen, 52 Mo. App. 117, et seq.; Melone v. Fidelity & C. Co., 71 Mo. App. 8; Land Co. v. Manning, 98 Mo. App. 267; Rice Bros. v. Bank, 98 Mo. App. 699.  (2)  Duress v. fraudulent advantage. PHILLIPS, P. J., in 18 Mo. App 680; Bell v. Campbell, 123 Mo. 14; Hensinger v. Dyer, 147 Mo. 227; Lappin v. Crawford, 186 Mo. 469.  (3)  If the consideration was in part to secure the debt and part to stop the prosecution, the whole consideration is illegal.  Malone v. Fid. Co., 71 Mo. App. 8; Woolfolk v. Duncan, 80 Mo. App. 427; Sawyer v. Sanderson, 113 Mo. App. 245; Tandy v. Com. Co., 113 Mo. App. 418; Bick v. Seal, 45 Mo. App. 477; Summers v. Summers, 54 Mo. 340.

*Hewitt & Hewitt* and *W. H. Haynes,* for respondents, filed argument.

BROADDUS, P. J.—This is a suit in equity to compel the defendants to bring into court and have canceled a certain assignment of valuable property made, it is alleged, to secure a fraudulent note for $2,-209.94, which said note and mortgage are alleged to have been obtained under duress.

At the time of this assignment, the defendants, Riggs and DeHart, were engaged as partners in the mercantile business at Weatherby, DeKalb county, and had been so engaged since the year 1894.  In June, 1903, the plaintiff moved from his farm to Weatherby

and engaged in the hotel business. Plaintiff's habit, after he moved to Weatherby, was to sit around the defendants' store, the parties having been acquainted for many years previously. After a while he began to assist defendants by handling their produce which was brought to the store, such as counting eggs, etc., and after a while began to wait on customers in the selling of goods, receiving money from the sales and making change. He procured all his groceries with the exception of meats from the store. After a while, defendants became suspicious that plaintiff was purloining goods from the store and money from the money drawer. It was his custom to wait on himself when he wanted goods, weigh and measure as the occasion required, and make change for his own purchases from the money drawer. While plaintiff was being watched by the defendants, they came to the conclusion that on one occasion he had taken $35 from the money drawer that had been received the day before on sale of some grain.

The defendants after this selected two reputable citizens, viz., Judge Harper and Thos. Crowder, to watch plaintiff. Harper was the first set to watch him and took charge of one of the money drawers on April 19, 1906. He testified on the trial that he counted the money and made a memorandum of the number and of the values of the pieces of money in the drawer; that shortly thereafter, plaintiff came into the store, took down what goods he wanted from the shelves, went to the cash drawer, pretended to put in money in payment for the goods and to make change, and left; that he immediately examined the drawer and found some had been extracted and that plaintiff had not put in any in payment for the goods he had taken. The witness testified that plaintiff acted in a similar manner on the succeeding day in taking goods and money from the drawer, not paying for them but extracting money

instead.   Mr. Crowder was then set to watch and his testimony also went to show that plaintiff took goods from the store and extracted money from the drawer. The evidence went to show in the most conclusive manner that plaintiff had been guilty of larceny of both money and goods.

The defendants finally confronted plaintiff with the charge of stealing their money and goods.   They had plaintiff come to their store and they, together with plaintiff and Crowder, all went to the Odd Fellows Hall, all being members of that society except DeHart. After they got into the Hall, some one informed plaintiff that he was accused of stealing defendants' goods and money, whereupon he said that they had "got the wrong man."   Mr. Crowder told plaintiff that there was no use denying the charge and then told him what he had seen him take during the time he was on watch.   Harper was then sent for and on his arrival was interrogated about what he knew in reference to plaintiff's conduct.   Defendants then told plaintiff they wanted a settlement with him for the amount he thought he had robbed them.   Plaintiff then asked them how much they thought it was.   One of the defendants said to him that he probably had a better idea of it than they did.   Plaintiff said: "Well, I am willing to turn over what money I have got to you, if that will settle it."   He was asked how much that was and he answered, "Something less than $1,000."   Whereupon, he was told that that would not satisfy the defendants. He then asked to know what would be right and was told by one of the defendants that the only way he knew to get at it, was to average the amount they had kept track of and estimate it from the time he had been there.   An average of the amount taken a day for the time he had been watched was found and this average was multiplied by the number of days he had been in the store,

which produced a result of $2,209.94, for which sum the note and assignment in question were executed.

Before the note and assignment were made, the parties adjourned for supper, after which they returned to the same place, and at this time defendant's lawyer had arrived, who dictated the writings which were then and there copied by a typewriter.

The defendant Riggs was asked, "What, if any, threats were made about prosecuting him?" He answered, "No . . . . He told us a number of times that we could send him to the penitentiary if we wanted to, but that wouldn't give the money back." He stated no threats were made by any one. The witness was then asked, "Tell the court whether or not you or Mr. DeHart, or Harper, or Judge Crowder, or any one else threatened that if he did not make that assignment he would be prosecuted?" A. "No, sir, there was no threats made." It was shown that before defendants made the charge against plaintiff they had sent for and had a consultation with their lawyer. The defendants assigned as a reason why they did not have the settlement in their store that they did not want the matter made public. .

The plaintiff was sixty-eight years of age and his doctor testified that he was afflicted with *angina pectoris*, or disease of the heart, and was subject to spells of suffocation, at which times his mind would not be as clear as usual, but that otherwise his mind would be clear. However, it was shown that during the entire transaction plaintiff was not excited, that he was cool and deliberate.

The court refused plaintiff's prayer for relief, dismissed his bill and rendered judgment for defendant for costs, and plaintiff appealed. The question presented by the record is whether plaintiff executed the note and assignment under duress, or under or by reason of undue influence.

Duress is defined as, "An actual or a threatened violence or restraint of a man's person contrary to law, to compel him to enter into a contract or to discharge one." [Bouvier's Law Dictionary.] In a recent case in this State, it is held that if the threats and innuendoes of prosecution superinduced the execution of the contract, it amounted to duress. [Lacks v. Bank, 204 Mo. 455.] Duress implies a restraint which overcomes the will. This may be brought about by threat of criminal prosecution, yet where no threat was made, but defendant was pressing a claim for a debt caused by the action of a clerk in taking property from a store without accounting for it, it does not constitute duress, especially after a settlement was made with a full and fair understanding of the nature of the transaction. [Francis v. Hurd, 71 N. W. 582.]

Applying the law governing the question of duress, we feel that the judgment of the trial court was for the right party, so far as the question of duress is concerned. No threats were used by the defendants to induce the plaintiff to execute the papers; on the contrary, they informed him that they had no intention to prosecute him. The defendants acted with great precaution in first consulting their lawyer before they confronted plaintiff with the charge of larceny or embezzlement, and we are justified in the conclusion that he advised them beforehand that a contract superinduced by threats would be invalid. In order to avoid publicity, they purposely had a meeting with plaintiff where what transpired would not become known to the public at large. Although the plaintiff asserted his innocence, yet the fact that at the same time he admitted that the evidence in the possession of defendants was sufficient to send him to the penitentiary, is convincing proof that his motive for making the settlement was fear of punishment, although he stated that he did so to prevent disgrace and distress to his family. However that may be, whether it was one or the other or both, can

make no difference, as the motive that actuated him would not invalidate the contract. His condition of mind must have been brought about by the threats of the defendants; otherwise, his act was voluntary. As it is said in Francis v. Hurd, supra, there must be threats used in order to constitute duress. It is presumed that every detected thief feels the fear of punishment and to say that while he was laboring under such fear he made restitution in the hope of avoiding punishment would constitute duress, would have the effect of depriving his victim of any redress whatever. The defendants had a right without regard to the hopes or fears of plaintiff to demand a settlement with him and to have him make good their loss.

Much stress is made by plaintiff's counsel on the arbitrary manner in which the amount of plaintiff's liability was fixed. It does not appear that he objected to the estimate, but that he willingly acceded to it as a basis for a settlement.

The evidence of plaintiff's physical condition and its effect upon his mind when under a strain of excitement fall far short of showing that his condition was such as to raise the presumption that any undue advantage was taken of him at a time when he was mentally incapable of knowing and asserting his rights. Much more might be said in favor of the judgment of the court, but we deem it unnecessary, as, in our opinion, there was a total lack of evidence going to show duress or that the contract was the result of undue influence over a mind weakened by disease. Affirmed. All concur.