KNIGHT *v.* BROWN.

1. DURESS—WHAT CONSTITUTES.
    Duress exists when one, by the unlawful act of another, is induced to make a contract or perform some act under circumstances which deprive him of the exercise of free will.

2. CHATTEL MORTGAGES—EXECUTION—DURESS.
    Where plaintiff admitted that no threats were made to induce her to sign a chattel mortgage which was given on an exchange of horses between herself and defendant, but, after holding out for several hours, and refusing to sign the mortgage, she finally did so on the insistence of defendant and his brother, that a valid trade had been made, and that, if she refused to sign, she would become liable for a larger amount than that for which the mortgage was given, the mortgage was not void for duress.

Error to Grand Traverse; Mayne, J. Submitted April 14, 1904. (Docket No. 61.) Decided July 27, 1904.

Replevin by Agnes Knight against Willard Brown. There was judgment for plaintiff, and defendant brings error. Reversed.

This is an action of replevin for a horse. The declaration is in the usual form; plea, the general issue. Plaintiff is a widow, living upon and carrying on her farm. She gave evidence tending to show that defendant suggested to her to trade her horse for a span of ponies owned by his brother, Harlan; that at defendant's request she

went with him to Harlan's house to see them; that they talked over the terms of the trade; that there was a mortgage on the ponies for $75; that this was to be discharged, plaintiff to execute a new one for $35, and defendant was to exchange a horse he owned with Harlan for plaintiff's horse, which Harlan was to have, and defendant was to give a mortgage of $50 for his part of the boot money; that she was to take the ponies, try them, and, if they suited her, the parties were to meet and consummate the trade; that one of the ponies, while she was trying them, kicked off the dashboard; that she immediately notified the defendant and his brother that she would not trade; that they told her that she had made the trade, and that the ponies were hers; that she tried to induce them to give up her horse, but they would not; that they insisted on her signing the mortgage and giving her note, and that the papers be executed immediately. Three other persons were present, one of whom drew the mortgage which plaintiff signed. Her own version of the conversation, which she claims to constitute duress, is as follows:

"Well, I held out there till after dark before I would consent to signing any mortgage at all, and that it was because they said they would throw the whole thing—the whole mortgage—onto my shoulders. They said I could either pay the $35 or pay the whole thing, just as I liked. Harlan Brown told me I could pay $75 or $35. They all went outside—Willard and Harlan—and they came in again, and I said I wouldn't sign the mortgage at all, not under these circumstances; and they finally went out. They came in, and they said: 'Well, you sign the mortgage. You sign for the $35.' In the first place, Willard says to Mr. Barnum, 'Tomorrow I am going to go and hire that $50 that I am to pay, and I will pay that to you, and then she can sign for the $35, or you can keep the horses, just as you are a mind to.' 'Well,' I says, 'if it is a have to be, it will have to be, but I am not going to sign for that any way. I will stand out for it yet.' Then they went outside and talked together. I don't know what transpired between them, but when they came in they said: 'You have your choice to sign for the $35 or else the whole thing. Sign for the $35, or we will throw the

whole thing onto your shoulders, and you can pay the whole thing.'   'Well,' I said, 'if it is a have to be, it will have to be a have to be, but I don't sign it with a good will.'"

She further testified that she held out from 3 or 4 o'clock in the afternoon until 8 o'clock.   She testified as follows:

" Q. What did Mr. Barnum do to you to make you sign those papers?

" A. Nothing.

" Q. Well, what did you sign them for, then?

" A. Because Mr. Barnum said he didn't know as there was any way out; that I had traded.   But he said I could get the horse by replevining it.   He told me that just before I signed the papers."

Mr. Barnum was one of those present.   She kept the ponies several days; then returned them to Harlan Brown. Whether she returned them before or after suit was brought we cannot determine from the record.   It is claimed by the defendant that they were not returned until after the suit was brought.   This, however, is immaterial, in the view we take of the case.   The case was submitted to the jury on the theory of duress.   The jury found that no trade was consummated, and that no title had passed to the defendant, and rendered a verdict in her favor.

*Parm C. Gilbert*, for appellant.

*Pratt & Davis*, for appellee.

GRANT, J. (*after stating the facts*).   We think plaintiff did not bring herself within the principle of duress as enunciated by the authorities.   In *Hackley* v. *Headley*, 45 Mich. 569 (8 N. W. 511), Justice COOLEY said:

"Duress exists when one, by the unlawful act of another, is induced to make a contract or perform some act under circumstances which deprive him of the exercise of free will."

According to her own statement, she held out for four

hours, refusing to sign the papers. Three parties were present who had no interest in the transaction. There were no threats. She was simply told that the defendant and his brother insisted that a valid trade had been made, and what the consequences were. She denied it. We do not find in her own version of the transaction any evidence that she was deprived of the exercise of her free will.

Judgment reversed, and new trial ordered.

The other Justices concurred.