LEWIS v. DOYLE.

1. DURESS—CONTRACTS—EVIDENCE.
   Duress exists where one is induced by the wrongful act of another to make a contract or perform some act under circumstances which prevent his exercising his free will.[1]

2. SAME—HUSBAND AND WIFE—MARRIED WOMEN.
   A wife may undoubtedly avoid a contract, otherwise valid, made by reason of the threatened criminal prosecution of her husband.

[1] As to contracts procured by threats of prosecution of a relative, see notes in 26 L. R. A. 48; 20 L. R. A. (N. S.) 484, and 37 L. R. A. (N. S.) 539.

3. SAME.

In cases based on alleged duress, the question is whether the complainant acted under the coercion of threats made by the defendant or his employees.

4. SAME—MARRIED WOMEN.

The mere fact that complainant's husband informed her that he had misappropriated money belonging to his employer, and feared he would be forced to go to jail, was not sufficient evidence of duress to avoid conveyances of the complainant to such employer of her husband in satisfaction of the claim.

5. HUSBAND AND WIFE—MARRIED WOMEN—CONTRACTS.

A married woman may convey her property in payment of, or as security for, her husband's debt, and such contract is sustained by sufficient consideration.

McALVAY, C. J., and KUHN and MOORE, JJ., dissenting.

Appeal from Ottawa; Cross, J. Submitted November 4, 1913. (Docket No. 63.) Decided July 25, 1914.

Bill by Dina Lewis against Edward M. Doyle for the cancellation of certain instruments of conveyance. From a decree for complainant, defendant appeals. Reversed.

*Jarrett N. Clark*, for complainant.

*Corie C. Coburn*, for defendant.

STONE, J. In this case the complainant filed her bill of complaint to set aside certain instruments, by the terms of which she conveyed her interest in the estate of her deceased father to the defendant.

Complainant, by her bill of complaint, claims that the instruments were procured from her under circumstances which amounted to duress, and for the sole consideration of preventing her husband from being prosecuted for embezzlement, and sent to the penitentiary.

The complainant is the daughter of Jan Van Eene-

naam, and she was married to one William A. Lewis. The complainant and her husband lived in Zeeland, Mich., for a time, and in 1906 went to the State of California because of the ill health of Mr. Lewis, who had consumption.  At Riverside, Cal., Mr. Lewis secured employment with the Riverside Steam Laundry Company.  He remained in the employ of the said company from June, 1907, to the last of November, 1909, when he was discharged because he had misappropriated some $1,900 belonging to the company. He had been employed as a driver of one of the wagons of the company, and his duties required him to collect the laundry and deliver the same, and also to collect the money due for the laundry work.  The misappropriation was of funds so collected by him.

Upon discovering the shortage, or misappropriation, negotiations were had which resulted in the complainant conveying to the defendant all of her interest in the estate of her deceased father in Michigan, with an agreement back, to pay over to complainant any sum of money which might be received from the property in excess of the sum of $1,900.  A few months prior to the time of the discovery of the misappropriation of the money by Lewis, complainant's father had died in Michigan and left a will by the terms of which complainant had an interest in his estate.  A copy of the will had been sent to the complainant.  The defendant had been informed that the complainant had inherited some property, and he also knew that Mr. Lewis had no property.  Mr. Lewis and defendant talked of a settlement of the shortage, and Mr. Lewis asked that he be given a day or two to arrange for a settlement, and informed the defendant that he desired to talk it over with his wife. Upon this branch of the case the complainant testified as follows:

"While in California, Mr. Lewis at first worked at

a grocery store, and then secured employment from the Riverside Laundry Company, and remained in their employ about three years, until the fall of 1909. That the reason he quit the employ was that Lewis said to complainant, his wife, that he was short in his accounts about $1,900. He came home on Tuesday; seemed to feel very sad; went into the parlor; sat in the Morris chair. I saw he was crying, and he said Doyle said he was short in his accounts nearly $1,900, and he said, 'I am out of work.' That was the first time that complainant knew her husband was short in his accounts. That the next day he said he asked to see the books, and that Mr. Doyle refused to show them to him. He said, 'Now, what can you do?' I said, 'Will, I can't do nothing; I have got my two little babies here, and can't do nothing.' He said, 'Something must be done, because I don't want to go to the penitentiary.' * * * Three days later Mr. Lewis came home in the laundry wagon, and it was raining, and he says, 'Now, hurry up and get ready, because Doyle wants us to come to his house;' and I says, 'What does he want us to come there for?' He says, 'He wants to talk to us.' I says, 'I wonder will there be anybody else there;' and he said, 'No, there won't be anybody there but me and my wife.' I was going to change my dress; I just had a dressing jacket on and an old skirt, and I was going to change it. He said, 'Don't get ready; just slip on your coat and go just the way you are. There is no time to waste.' We went down to Mr. Doyle's. Mr. Cathcart was sitting there. Never saw him before. Then Mr. Byrne stepped in from the dining room. Mr. Byrne was a lawyer at San Bernardino. Doyle introduced us to Byrne, saying, 'This is the man who is short in his account.' And then Mr. Lewis produced a copy of the will, which I did not know Mr. Lewis had. Then Mr. Doyle told me, 'You and the children go into the kitchen; Mrs. Doyle is there.' I went and stayed 15 or 20 minutes. The door was closed behind me. I said to Mrs. Doyle, 'I am awfully sorry I have to come on an errand like this. I hope they won't send Mr. Lewis to the penitentiary.' Mrs. Doyle said nothing. After awhile Mr. Doyle came in, and I went into the parlor where the men were. Mr. Byrne read the

will to me and said, 'Now Mrs. Lewis you must sign away your whole inheritance,' and he took that paper, and he hit that like that (indicating) into my face. I thought he was going to slap me with that paper, and he said, 'If you do not sign that paper we will prosecute your husband, and we will send him to the penitentiary. We have no time to bother; you must hurry and sign that paper.' I did not want him to go to the penitentiary. He was a consumptive husband, and I knew he could not live long. I was a total stranger in Riverside; I didn't want Mr. Lewis to go there. * * * He took that paper and just went to me and said, 'Now you shall sign away your inheritance, because we have no time to bother, and you must hurry up and sign.' I says, 'What if you get more than $1,900?' Then he said, 'What the balance is we will return to you every penny, what the balance is.' And then we came home. I signed the paper there to keep my husband from going to the penitentiary. I believed Mr. Lewis would be prosecuted for taking this $1,900 unless I signed it. * * * A week or ten days later the telephone rang and Mr. Lewis answered the phone and said, 'Doyle wants us to go up to the courthouse and sign a paper.' It was raining hard, and I said, 'Why do we have to go to-day?' And he said, 'Doyle said we must go today.' We went to the prosecutor's office, and Mr. Lewis took me there, and I signed a paper there; do not know what I signed. I asked no questions and the paper was not read to me. Mr. Evans and Mr. Lewis were in the room when I signed the paper, and I signed that because I thought it would keep him from going to the penitentiary."

It is undisputed that the instrument first signed by complainant was indorsed upon the back of the copy of the will, and was made to Mr. Byrne in trust for the laundry company, until the value and condition of the property in Michigan could be ascertained, with the understanding that, if the property proved satisfactory, a more formal assignment of the claim of complainant would be made to the defendant, Doyle, in trust for the laundry company. The conditions of

the property being satisfactory to the defendant, the instrument of which the complainant speaks as having been made at the prosecutor's office was a formal assignment in the nature of a quitclaim deed, appearing in the record as Exhibit A which appears to have been signed and acknowledged by the complainant and her husband on the 9th day of December, 1909, and the acknowledgment was before Lyman Evans, a notary public, Mr. Evans being the person referred to by the complainant as the prosecutor. He appears to have been the prosecuting attorney of Riverside county.

After a careful reading of this record, we are of opinion that this case should be disposed of upon the facts and the weight of the testimony. The case must turn upon the facts as to what occurred at the home of Mr. Doyle at the time the first instrument was signed. Upon that subject the defendant, Doyle, testified. Both complainant and defendant testified in open court. In support of the testimony of the defendant there were read in evidence the depositions of Mrs. Edward M. Doyle, W. E. Byrne, and Robert Cathcart. Their testimony as to what occurred at the house is in direct conflict with that of the complainant. Mr. Doyle testified that, after the amount was agreed upon which Mr. Lewis owed the laundry company, Lewis suggested that, instead of having a meeting at the office, it should be held elsewhere, and Mr. Doyle suggested that it could be at his house; that this was done because Lewis wanted to keep the matter of his shortage from his friends and the people, and asked Mr. Doyle as a favor to keep that quiet; that there were no threats whatever to arrest Mr. Lewis made at the house; that neither Mr. Doyle nor anybody else said that, if the matter was not settled right up, they would send Lewis to the penitentiary; that the word "penitentiary" was not used, and that

complainant and his wife appeared to be anxious to have the matter settled; that no such language was used by Mr. Byrne or anybody else, as testified to by complainant.

Mrs. Doyle testified that shortly after Thanksgiving, 1909, at her home, she and others had a conversation with complainant; that at this time Mrs. Lewis executed a deed of the property in Michigan to W. E. Byrne, which was read to Mrs. Lewis and her husband before she signed it, and that they also read it themselves; that this deed was written on the back of a copy of the will, because there was no other available paper in the house; that the said instrument was prepared at the request and suggestion of Mrs. Lewis; that complainant said she knew her husband was short in his accounts, and that the money had been used for household expenses; that when complainant and her husband came to witness' house complainant said that they had come to see if they could not make a settlement of the indebtedness of Mr. Lewis to the laundry company, and that they had the means to make such a settlement; that no one said anything to complainant about her husband committing embezzlement, or any other crime, for which he could be prosecuted and sent to the penitentiary; that witness saw Mrs. Lewis during the entire time she was at her home, and heard everything that was said by complainant and by others to her in her presence and hearing; that neither Mr. Byrne nor any one else said to her that she must sign away her inheritance, or sign any paper, or her husband would be prosecuted and sent to the penitentiary; that such language was not used at all by any one; that no one said to her, "Hurry up and sign this; we have no time to waste; you must sign or we will have him sent to the penitentiary," or words to that effect, or anything of the kind; that nothing was said in her presence

and hearing to the effect that unless Mr. Lewis' shortage was settled that he would or could be arrested, and criminally prosecuted; that at one time the witness and the complainant left the room, and complainant said to her that she was sorry that this had happened, and she would pay every cent back if it took all she had, and that it was very kind of Mr. Doyle to accept the settlement; that the complainant, while at the house, did not appear worried or afraid; that no one said or caused anything to be done which would cause complainant to be frightened or worried; that no one made any threats or attempted to pursuade or coerce complainant or her husband to sign the paper; that Mr. Byrne took the paper in his name at the request of complainant, and was to hold the same until investigation was made of the Michigan property, and that, if Mr. Doyle decided to accept the Michigan property in settlement of Mr. Lewis' indebtedness, then Mrs. Lewis was to deed the property to him for the laundry company, and that Mr. Doyle should pay Mrs. Lewis all that he received over $1,900 from the sale of the property; that the matter of deeding was fully discussed in the presence of complainant, and that she and her husband both did the talking; that complainant talked with her husband, and thoroughly understood the matter, and was perfectly satisfied.

This testimony of Mrs. Doyle is fully corroborated by the testimony of Robert Cathcart and W. E. Byrne. The deposition of Lyman Evans was also read to the effect that, according to his recollection, Mr. and Mrs. Lewis signed the deed in his presence on December 9, 1909; that he asked her if she fully understood the purpose, nature, and effect of the instrument before he took her acknowledgment; that, while he had no distinct recollection in this case, it was his custom to do this in all cases.

It further appears that in the fall of 1910 Lewis was arrested upon another charge of obtaining money under false pretenses or forgery, and was released on probation, and died in July, 1911.

In September, 1910, Mr. Clark, of Zeeland, Mich., wrote to complainant in behalf of the administrator of her father's estate, and with reference to the transfer of her interest to the defendant. On the 19th of that month complainant wrote to Mr. Clark in reply, stating that she did not sign over to defendant her entire share of the estate, but had given him a power of attorney to collect $1,900, which represented the amount of money he had loaned to her and her husband. Mrs. Lewis, in her testimony, claims that this letter had been prepared by her husband, and that she had been induced by him to sign and send it, but that it did not represent the facts. Later, and in the month of May, 1911, a paper had been received by Mrs. Lewis which was in the form of a petition to the probate court of Ottawa county, Mich., consenting to an immediate division and distribution of the estate, and waiving a clause which gave her and her sister a five-year use of the income of a certain portion of the estate. As a part of that paper, there was a statement prepared to be signed by defendant, as assignee of all the interest of the complainant in the estate, consenting to the relinquishment of all the rights of Mrs. Lewis in that clause of the will above referred to. This instrument Mr. Doyle declined to sign until he could know more definitely about the amount that would be realized from the estate. On the 8th day of May, 1911, an agreement was entered into between the heirs and legatees of this estate, which had been signed by Dina Lewis and other heirs, which contained, among other things, this clause:

"All the other heirs, legatees, and devisees agree to pay to the said Christina Elgersma (her sister), and

Dina Lewis, or her assigns, that amount that would have been paid to them during said five years at the time this estate is closed," etc.

There ought not to be much question about the law governing a case of this nature, under our decisions. Duress exists where one is induced, by another's unlawful act, to make a contract or perform some act under circumstances which prevent his exercising his free will. *Hackley* v. *Headley*, 45 Mich. 569 (8 N. W. 511) ; *Knight* v. *Brown*, 137 Mich. 396 (100 N. W. 602).

Undoubtedly a wife may avoid her contract, otherwise valid, made by reason of the threatened criminal prosecution of her husband. *City Nat. Bank of Dayton* v. *Kusworm*, 88 Wis. 188 (59 N. W. 564, 26 L. R. A. 48, and note, 43 Am. St. Rep. 880).

In the opinion of the circuit judge, found in the record, is the following:

"It is not necessary to decide whether or not her husband had committed an offense for which he could be sent to the penitentiary. She (complainant) believed that he had, and she conveyed her inheritance to the defendant for the express purpose of saving her husband from going to the penitentiary, and she was compelled to enter into the arrangement for that purpose."

If by the closing language above quoted the circuit judge meant that complainant was compelled, by the defendant, to enter into the arrangement, we cannot agree with him.

The question is one of fact whether the complainant acted under the coercion or threats of the defendant or those employed by him. To justify a court in rescinding a contract on the ground of duress, the testimony should be cogent and the case made out by a clear preponderance. The burden is upon complainant to make her case, and the testimony, as a whole,

ought to be sufficient to overcome the presumption that the contract was freely made, and was one of fair dealing. From a review of the whole record, we are unable to find by any preponderance whatever that the complainant was deprived of the exercise of her free will by any act of the defendant, or anybody in his employ or interest. The most that can be said from the testimony, as a whole, on behalf of the complainant, is that her husband gave her to understand that he was in danger of a criminal prosecution, and that he feared the penitentiary, and didn't want to go there. But, unless the defendant was responsible for this conduct of complainant's husband, her fear, or her husband's fear, in the matter would not operate as such duress as would justify the setting aside of the conveyance.

In the case of *Morse* v. *Woodworth*, 155 Mass. 233, at page 250 (29 N. E. 525, at page 528), the supreme judicial court of Massachusetts said as follows:

"The rule as to duress *per minas* has now a broader application than formerly. It is founded on the principle that a contract rests on the free and voluntary action of the minds of the parties meeting in an agreement which is to be binding upon them. If an influence is exerted on one of them of such a kind as to overcome his will and compel a formal assent to an undertaking when he does not really agree to it, and so to make that appear to be his act which is not his but another's, imposed on him through fear which deprives him of self-control, there is no contract unless the other deals with him in good faith, in ignorance of the improper influence, and in the belief that he is acting voluntarily."

In *Compton* v. *Bunker Hill Bank*, 96 Ill. 301 (36 Am. Rep. 147), where the wife executed and acknowledged a deed conveying her land to the bank, whose money her husband had embezzled to a large amount, to save him from arrest and criminal prosecution, and it appeared that the wife was urged to make the con-

veyance by her husband and brother, who informed her that if she would do so the bank would not prosecute, and the bank had no knowledge of any such representations being made to induce the execution of the deed, nor authorized any to be made, and none of its officers had any conversation with the grantor on the subject, it was held that a court of equity would not set aside the deed for fraud, duress or imposition. See, also, *Lefebvre* v. *Dutruit,* 51 Wis. 326 (8 N. W. 149, 37 Am. Rep. 833), to the same effect.

In this State there can be no doubt of the right and power of a married woman to convey her property in payment of, or security for, her husband's debt, and that such conveyance has a sufficient consideration. *Kieldsen* v. *Blodgett,* 113 Mich. 655 (72 N. W. 9).

While complainant testifies that she did not know what instrument she signed on the 9th day of December, 1909, yet she says that she supposed that it was to carry out the arrangement made at defendant's house. This is true, and is all that that instrument purported to be. This action was taken by her more than ten days after the first instrument had been signed, and it would seem that there had been sufficient time for her to have considered what she was doing, and to rebut any duress claimed to have been exercised upon her on the first occasion. *Francis* v. *Hurd,* 113 Mich. 250 (71 N. W. 582).

We have examined the numerous cases cited by counsel for complainant and fully recognize the doctrine which those cases announce, but are of opinion that this case must be disposed of upon the facts and the principle above stated. Not only has the complainant, in our opinion, failed to make out a case for equitable relief by any preponderance of evidence, but the evidence in the case is overwhelming against her to the effect that she acted voluntarily and freely at

the time she executed the two instruments, and that no force, fraud, or duress was exercised by defendant, or by any one with his knowledge.

The circuit court granted the relief prayed for by complainant. We cannot agree with this result. In our opinion, complainant has failed, by the evidence, to make a case entitling her to any relief.

The decree of the circuit court is reversed, and the bill of complaint dismissed, with costs to defendant.

BROOKE, OSTRANDER, BIRD, and STEERE, JJ., concurred with STONE, J.

MCALVAY, C. J. (*dissenting*). The facts in this case are clearly stated in the opinion written by Mr. Justice STONE. There is no question of law presented by this record, and it must be disposed of upon the facts presented by the record. I have read all of the testimony with great care, and after thoughtful consideration I find it impossible to agree with Mr. Justice STONE in his conclusion that the case should be reversed and the bill of complaint dismissed.

The story of this complainant is a simple one. She was a woman of intelligence and character, with some prospect of a small inheritance, who went from Michigan to California to find a better climate for her sick husband who was suffering from tuberculosis, also taking with her two little children. Her husband found employment with a laundry, of which defendant was manager, where most of his time was spent in the open air driving the laundry wagon. This employment continued for about three years, when, about Thanksgiving day, 1909, he was discharged and accused by his employer of having wrongfully appropriated about $1,900 of the money which had come into his hands by way of collections made in the course of his work. He went to his wife and first informed her that he had lost his employment, and

afterwards made confession to her that he was charged with being short in his accounts. He desired her to help him out, saying that something must be done to keep him out of prison. This she hesitated to do on account of the little children. The defendant knew that the husband was without means, and that the wife, through her father's estate, had inherited some property.

So far there appears to be no dispute upon the facts, and this statement of conditions and the situation is taken from the testimony of complainant, now a widow.

Three days after complainant was told of her husband's wrongdoing she was sent for by the defendant to come to his house with her husband; her understanding, received through her husband, being that there would be no one present except defendant. She was taken there by her husband in defendant's laundry wagon, with defendant's knowledge, and so great was the husband's urgency that, although she desired to change her dress, having on only a dressing jacket and an old skirt, he stated there was no time to waste; "just slip on your coat and go just as you are." Upon arrival at defendant's residence she found defendant, Mr. Cathcart, a stockholder and director in the laundry company, and Mr. Byrne, defendant's attorney, who was introduced to them by defendant, who said: "This is the man who is short in his accounts." Her husband produced a copy of her father's will, which she had no knowledge was in his possession.

To this point her testimony does not appear to be disputed. Her statement of what followed, the threatening attitude of defendant's attorney toward her and what was said and done, as contained in the excerpt from her testimony in the opinion of Mr. Justice STONE, are in sharp dispute. She is contradicted by

the defendant, his attorney and witnesses, all, except defendant's wife, present by appointment. Defendant was the only witness on his part who testified in open court. The testimony of the others was taken by depositions. It is admitted that this meeting resulted in a memorandum in the nature of an assignment of all of her interest in her father's estate to defendant's attorney, Byrne, in trust for the laundry company, written by defendant's attorney upon the back of a copy of her father's will as a preliminary security, with an understanding that, if defendant realized more than $1,900 from this property, the surplus would be paid to complainant.

Later, after an investigation had been made on the part of the defendant as to the value of this Michigan property, on December 9, 1909, a deed and assignment of all this interest in her father's estate to defendant was made out by defendant's attorney, signed and acknowledged by complainant and her husband, and also a written agreement of the same date was executed by defendant to pay all money realized from the sale of such property received in excess of the sum of $1,900.

The deed was taken to the office of the prosecuting attorney for Riverside county, Cal., by defendant for execution by complainant and her husband and for acknowledgment before Prosecutor Evans.

There is a monotony of statement in the testimony of defendant and the depositions of his witnesses which does not accord with the ordinary testimony of witnesses who testify independently their individual recollections of facts. Defendant's attorney testifies positively that he went to defendant's house at the time complainant made the assignment of the interest in her father's estate without any knowledge of the subject-matter for which his services were desired; that he had been told nothing about any busi-

ness to be done between defendant and complainant's husband. Defendant as positively testifies that when he made the appointment with his attorney he told him all of the facts in regard to this matter. In defendant's testimony he makes an effort to have it appear that the meeting at his house where he had surrounded himself with these witnesses to observe what occurred when complainant gave away her entire estate to save her husband was like a family gathering.

This opinion has been extended to greater length than was intended. My conclusion is that the testimony of complainant is substantially true. Her husband, evidently a weak, sick man, now dead, had gotten into this difficulty, and complainant in her devotion to him was willing to, and did, sacrifice her entire property. That pressure was brought to bear upon her, sufficient to cause her, under the circumstances, in her sense of fear of what would happen in case she refused, to make this conveyance to defendant to save her husband from prison, is evident. She was not a strong woman physically; and her actions at the time were the natural result of surrounding conditions.

My conclusion is that the learned trial judge, before whom the testimony of the parties to this suit was heard, being the only witnesses to the material facts in this case who were sworn, with his opportunity to judge from their personal appearances, arrived at a correct conclusion, and that the decree which was granted to complainant by the circuit court should be affirmed, with costs of both courts in favor of complainant to be taxed.

KUHN and MOORE, JJ., concurred with MCALVAY, C. J.