## VOORHEES v. NELSON.

1. DURESS—THREAT OF PROSECUTION—CONTRACTS.

   Threats of prosecution, unaccompanied by any threat of immediate imprisonment, do not amount to duress.

2. SAME—ILLEGAL TRANSACTION.

   Where plaintiff entered into a fraudulent transaction with several others to wager money on a horse, understanding that the opposing jockey had been bribed to throw the race to the horse on which plaintiff was betting, but the race did not result as they anticipated, and where defendant N. had been induced by plaintiff to become a party to the fraud and he also placed a considerable sum on the losing horse, and where defendant's agent whom he sent to plaintiff to obtain a settlement after learning that plaintiff had shared in the amounts secured from defendant, made threats of prosecution which intimidated plaintiff and caused him to pay defendant a large sum in settlement of the unlawful transaction, plaintiff not paying the money to defendant until several days had elapsed, but claiming that he was influenced by the threatened prosecution, he was not entitled to recover on the ground of duress, since there was no evidence of threatened imprisonment, and for reasons of public policy plaintiff

should not be permitted to recover money paid as a part of an illegal and fraudulent transaction wherein plaintiff participated as one of the principals. OSTRANDER and STONE, JJ., dissenting.

Error to Gratiot; Searl, J. Submitted October 9, 1914. (Docket No. 59.) Decided January 3, 1916.

Assumpsit by Peter R. Voorhees against Clinton Nelson and others for the recovery of money paid under duress. Judgment for plaintiff against defendant Nelson, who brings error. Reversed.

*Lyon & Moinet,* for appellant.

*Walbridge & Kelley,* for appellee.

In October, 1908, plaintiff was introduced to one Coon by a man named Adams. Adams was an old acquaintance of plaintiff, and a man with whom plaintiff had occasionally played poker. Before the introduction Adams asked plaintiff if he would like to go into something where he could make some easy money. Plaintiff replied that it would depend on what kind of a scheme he had. Adams assured him that it was all straight and that Coon, to whom he then introduced him, would supply the details. Coon thereupon unfolded a plan to the plaintiff, in brief as follows:

He represented that one Guernsey, a cousin of his, was working for a bunch of Pittsburg "millionaires," who were the owners of a fast horse; that they were sports and ready to back their horse for a large sum of money; that Guernsey, their employee, had a horse which would be run against the horse owned by the "millionaires;" and that through a corrupt arrangement with the jockey riding the "millionaires'" horse, the "race" would be thrown against the "millionaires." It was further represented by Coon to the plaintiff that it was necessary for his cousin, Guernsey, to have

some one bet the money which Guernsey would furnish against the money which the "millionaires" would wager upon their horse. Coon asked plaintiff to accompany him to Council Bluffs, Iowa, where the "millionaires" then were, and to there bet Guernsey's money against their money, and thus assist in the swindle. Plaintiff at that time was 50 or 55 years of age and had lived in the city of Alma about 13 years, had worked in a sugar factory, had been a contractor, had acted as clerk in two different hotels, and was at that time engaged in the real estate and money loaning business. Defendant Nelson was at that time about 56 years of age, and had lived in Gratiot county 33 years. He was a farmer, bought and sold stock, loaned money, and was a stockholder in both banks in the city of Alma.

Shortly after the first conversation between Coon and plaintiff, plaintiff met defendant Nelson and proposed that Nelson accompany him to Council Bluffs in connection with the proposed "race." He told Nelson that Coon's cousin, Guernsey, had agreed to divide with him (Coon) whatever they won from the "millionaires," and that Coon had agreed to divide his share with the plaintiff, and agreed that if defendant Nelson would go out there with him that if he got any money he would divide with Nelson. Defendant Nelson being influenced by the too common desire for "easy money" readily consented to go, and in turn disclosed the details of the project to one Hooper, another resident of Alma, and asked him to go along to see the "race." Hooper consented and immediately the four —Coon, plaintiff, Voorhees, and defendants' Nelson and Hooper—started for Council Bluffs. Arrived in that city, in due course, Coon produced and introduced to the party his "cousin" Guernsey. Guernsey made it plain to the party that the project was a rich one, but asserted that it would be necessary for the man who

did the betting to be able to produce some evidences of financial responsibility. Whereupon plaintiff asserted that he was unable to furnish such evidence, but announced that defendant Nelson could do so. It seems to have been suggested by Guernsey that $20,000 should be deposited in a bank in Council Bluffs, not to be used, but as evidence to convince the "millionaires" that real money was to be put up against their cash. At this stage of the proceedings plaintiff and defendant Nelson each wrote a letter to one Brewbaker, cashier of the bank at Alma, for the purpose of arranging a credit there for defendant Nelson so that he could make the necessary showing of financial responsibility in Council Bluffs. Later they concluded that the matter could not be arranged by mail, and defendant Nelson returned to Alma with the intention of arranging it in person. After a conference with the cashier of the bank he returned to Council Bluffs without any money, but further representations having been made to him as to the necessity, he again came to Alma, and upon this occasion took back to Council Bluffs with him a draft for $2,000. This he deposited according to instructions in a bank in Council Bluffs. Although Guernsey expressed dissatisfaction with the smallness of the amount, it was agreed that the match should be made and the "race" proceed. The betting took place in a hotel in Council Bluffs. In one room were defendant Nelson, Hooper, and Coon, and in another room were Guernsey and the "millionaires." At the last moment before the betting started it was suggested by Guernsey that defendant Nelson do the betting instead of plaintiff, Voorhees, because Voorhees was "nervous." The parties agreed to this, and Guernsey turned over to Nelson $5,000 in new currency of $100 denomination.

The *modus operandi* appears to have been as follows: Nelson would bet $1,000, which would be car-

ried into the next room and placed in the hands of Guernsey, who, because of his relations to the "millionaires" acted as stakeholder. There this sum was supposed to be covered by an equal amount wagered by the "millionaires." This process would be repeated from time to time. When the $5,000 furnished by Guernsey was exhausted, he found means of returning it to the possession of Nelson, who would thereupon repeat the process. During the first session while this game was being carried on, Nelson theoretically wagered $18,000, and a like amount, the property of the "millionaires," was supposed to be in possession of Guernsey. At this point a recess was taken, when it was hinted to defendant Nelson, Coon, and Hooper that the "millionaires" had remarked upon the fact that their opponents were possessed of so much new money. Somebody thereupon suggested that defendant Nelson withdraw his $2,000 from the bank, which would be paid to him in old bills, that $2,000 of the new money should be exchanged for his $2,000, and that for security this should be placed beneath his nightshirt in his grip, and the old money used in its stead to allay the suspicion of the "millionaires." At the adjourned session this plan was carried out. The betting proceeded as before, but when Guernsey returned the money by messenger to be bet over and over again by Guernsey, it was placed in Nelson's satchel, from which Nelson withdrew it to wager from time to time. The betting finally amounted to the sum of $33,000, when it was discovered by defendant Nelson that the $2,000 supposed to be under his nightshirt had become mixed with the other money, and that he had inadvertently wagered that as well as the money received by him from Guernsey. Defendant Nelson upon making this discovery became convinced that he was being swindled, but was convinced that it would be useless to try to recover his money. The "race"

took place the next morning. Through the sudden indisposition of the jockey riding Guernsey's horse, which occurred at a moment when the "race" was almost won, the race was lost, and with it the $2,000 belonging to defendant Nelson. After the "race" was over and on the same day, plaintiff and defendants Nelson and Hooper left Council Bluffs for Alma.

Some time in the year 1909 the Federal authorities in Council Bluffs arrested and prosecuted the Mabray gang, for the perpetration of this among other frauds. Coon appears to have given evidence on behalf of the people in that proceeding. Plaintiff and defendant Nelson were likewise witnesses. In giving his testimony in the criminal case at Council Bluffs, plaintiff denied that he had ever written or seen any letters in connection with the fraud which had been perpetrated. Defendant Smith, the deputy postmaster at Alma, seems to have been active on behalf of the government in producing testimony for the trial at Council Bluffs. It appears that some time after that trial and in March or April, 1910, Coon disclosed to Smith, the alleged fact that plaintiff had been paid a portion of the money out of which defendant Nelson had been swindled at Council Bluffs. Coon, himself, had at that time paid to defendant Nelson about $550. Acting on the information obtained from Coon, Smith interviewed the plaintiff and told him that defendant Nelson believed that he, plaintiff, had participated in the fraud and in the avails thereof. Plaintiff stoutly denied his participation. He testified that Smith threatened if he did not make good Nelson's loss that Nelson would cause his arrest and prosecution in Council Bluffs for his share in the fraud. Smith denied that he made threats of any kind, but admits he told plaintiff that Nelson believed the story related by Coon to the effect that plaintiff had secured part of the money out of

189 Mich.—44.

which he (Nelson) had been swindled. Several days elapsed between the time this information was conveyed to the plaintiff and April 2, 1910, upon which date plaintiff paid over to defendant Hooper for the use of defendant Nelson the sum of $2,278.50, taking therefor the following receipt:

"ALMA, MICHIGAN, April 2, 1910.
"For a consideration this day received from Peter Voorhees by me, the same being in full of all claims against him in the matter of the Council Bluffs case, and I hereby agree to commence no action against the, said Voorhees in any matter growing out of this affair, the same having been fully settled to my satisfaction.
[Signed]                              "C. NELSON."

On April 22, 1912, 2 years and 20 days after the payment of the money, plaintiff brought his action against the three defendants, Nelson, Hooper, and Smith, charging a conspiracy between the three, and that the money had been paid by him under duress. Upon the trial the court held there was no evidence sufficient to carry to the jury the question of conspiracy, and directed a verdict in favor of defendants Hooper and Smith. He, however, submitted the case to the jury as against defendant Nelson solely upon the question of duress. Under the charge as given the jury returned a verdict in favor of plaintiff for the full sum with interest. The judgment entered thereon is now reviewed in this court by defendant Nelson.

BROOKE, C. J. (*after stating the facts*). As the sole question upon which the case went to the jury was one of duress, it becomes pertinent to examine with some particularity the testimony of plaintiff bearing upon that question. Referring to the defendant, plaintiff testified:

"He did say that in my office when George Sharrar and Mr. Hooper and I were present. He said to me

right there, 'Mr. Voorhees, if you are not guilty, I don't want a dollar of your money.'

"*Q.* You believed Mr. Nelson meant that when he told you that there, did you not?

"*A.* Believed he meant what?

"*Q.* Just what he said, that he didn't want a dollar of your money unless you were guilty?

"*A.* Yes, sir; I think so.

"*Q.* You thought so then and you think so now, don't you?

"*A.* Yes, sir; I do.

"*Q.* You thought that Clint Nelson was and is sport enough so that he would not want a dollar back unless you were guilty?

"*A.* I don't think he would. Mr. Nelson made no threat to me of any kind, character, or nature at any time.

"*Q.* The strongest or nearest to any threat that he ever made to you was to say to you, if you are not guilty he didn't want a dollar of your money?

"*A.* Yes, sir."

Plaintiff, further testifying as to what defendant Smith had told him, said:

"Then he said that I would have to fix it up with Mr. Nelson, and if I didn't that somebody was going to prosecute me.  *  *  *  And he told me that I had better see Mr. Nelson and get the matter fixed up. Why, they said they were going to take me to Council Bluffs, and prosecute me out there. I didn't know but what they would land me in jail. I could not go there without anybody to go on my bond. I was scared to death. I didn't know but that they would land me in jail.

"*Q.* You expected that you might be taken out there at any minute?

"*A.* Yes, sir. * * * I claim that in my own mind I was perfectly innocent of any charge upon which any prosecution could be grounded. And being entirely conscious of my own innocence, I immediately lost my nerve."

It is quite clear from the foregoing that defendant

Nelson himself made no threats of any kind against the plaintiff. On the contrary he repeatedly told plaintiff that if the plaintiff were innocent, that is, if he had not shared in the money out of which defendant Nelson had been swindled, he should not pay a dollar. Assuming (though it is flatly denied by Smith) that Smith made the threats as testified to by plaintiff and that such threats were made by the authority of defendant, of which there is no proof in the record, do they amount in law to duress? We are of opinion that this question must be answered in the negative. In the early case of *Hackley* v. *Headley,* 45 Mich. 569 (8 N. W. 511), Mr. Justice COOLEY, speaking for the court, said:

"Duress exists when one by the unlawful act of another is induced to make a contract or perform some act under circumstances which deprive him of the exercise of free will. It is commonly said to be of either the person or the goods of the party. Duress of the person is either by imprisonment, or by threats, or by an exhibition of force which apparently cannot be resisted."

In the later case of *Beath* v. *Chapoton,* 115 Mich. 506 (73 N. W. 806, 69 Am. St. Rep. 589), this court, speaking through Mr. Justice GRANT, said:

"Threats of criminal prosecution, unaccompanied by threats of immediate imprisonment, do not constitute duress"—citing *Harmon* v. *Harmon,* 61 Me. 227 (14 Am. Rep. 556) ; *Buchanan* v. *Sahlein,* 9 Mo. App. 552; *Bodine* v. *Morgan,* 37 N. J. Eq. 426; *Dunham* v. *Griswold,* 100 N. Y. 224 (3 N. E. 76) ; and *Preston* v. *City of Boston,* 12 Pick. (Mass.) 7, 14.

See, also, *Clement* v. *Mercantile Co.,* 172 Mich. 243 (137 N. W. 657), and *Dallavo* v. *Dallavo, ante,* 350 (155 N. W. 538).

Defendant Nelson's eighth request to charge was as follows:

"The Supreme Court of this State in *Beath* v. *Chapoton,* 115 Mich. 506, 509 [73 N. W. 806, 69 Am. St. Rep. 589], declares the law to be that 'threats of criminal prosecution unaccompanied by threats of immediate imprisonment, do not constitute duress,' and in accordance with that holding I charge you that there was no duress in this case and that plaintiff cannot recover against any of the defendants."

We are of opinion that this request should have been given. It is worthy of note that plaintiff, upon the payment of the money for which he brought suit, secured from defendant the receipt which is set out in the statement of facts, and that he permitted the matter to stand without disaffirming the contract or making any demand for the return of his money for more than two years. In the meantime the Federal statute of limitations (U. S. Comp. Stat. 1901, § 1044), had run in his favor so that a prosecution against him for complicity in the fraud perpetrated at Council Bluffs was barred. He testified that he held this receipt as a protection against such prosecution.

Although plaintiff is barred from recovery in this case because the payment of the money was not secured by the exercise of legal duress, we think, a broader ground exists for reaching the same conclusion. The payment of the money was corollary to, if not a distinct part of, the illegal and fraudulent transaction in which plaintiff frankly admits he participated as a principal. Whether his original purpose was to help swindle his friend, defendant Nelson, or simply to help Nelson and Guernsey to swindle the "millionaires," or whether he actually participated in a division of defendant Nelson's money, appears to be of no consequence. Public policy demands that the courts be closed to men such as the plaintiff when they come demanding relief from consequences which result from their own admittedly illegal and fraudulent acts.

The judgment is reversed, and there will be no new trial.

MOORE and STEERE, JJ., concurred with BROOKE, J.

KUHN, J. I concur in the result reached by Justice BROOKE, as to the question of duress.

OSTRANDER, J. (*dissenting*). The trial court advised the jury:

"You will readily see it all gets down to the question of whether Voorhees at the time he paid this money over was acting as a free moral agent. Did he have his will power and exercise it there? It is not sufficient for him to show to you that the threats were made; that alone is not enough. It is not enough for him to show that the threats were made and that he had some fear of arrest or some fears that the government would take some proceedings against him or investigate further. That is not sufficient. But in order to recover here, he must show to you that these threats that were made in behalf of Nelson, if they were made in behalf of him as the plaintiff claims, had such an influence upon him and over him and upon his mind as to so put him in fear of the results of what might happen if he didn't pay, as to take away his will power and impelled him to pay any way, against his wishes.

"In considering whether he was so under duress and so in fear and compelled to pay, considering whether he did act as a free moral agent or not, you should consider all that had come to the knowledge of Voorhees. You will remember that there was some testimony of Sharrar having been told by Smith, if I remember correctly, something about this transaction, and that Sharrar testifies that he communicated that to Voorhees. You have a right to consider that, if you find it to be true, even though that didn't come directly from Nelson, as determining the condition of Mr. Voorhees' mind. How much was he worked up about the matter? And I think it is practically conceded by everybody that he was somewhat excited. The question is what was his condition of mind. How much was he put in fear, to what extent, at the time the

transaction was finally closed up? If it was to the extent that he could not resist, his will power was overcome by reason of the fear, then the money was involuntarily paid and he may recover it back. Otherwise he cannot do so."

This, I think, is a fair statement of the applicable law. *Lewis* v. *Doyle,* 182 Mich. 141 (148 N. W. 407); *Nelson* v. *Leszczynski-Clark Co.,* 177 Mich. 517 (143 N. W. 606); *Clement* v. *Mercantile Co.,* 172 Mich. 243 (137 N. W. 657); *Cribbs* v. *Sowle,* 87 Mich. 340 (49 N. W. 587, 24 Am. St. Rep. 166); *Koons* v. *Vauconsant,* 129 Mich. 260 (88 N. W. 630, 95 Am. St. Rep. 438). There was, in my opinion, abundant testimony to sustain a verdict for plaintiff under the charge of the court.

It is clear, and the jury was advised, that defendant Nelson had no claim against plaintiff which he could have enforced. Plaintiff denies that he ever had any of the money which Nelson lost at Council Bluffs. But Nelson demanded and received from plaintiff $2,-278.50, and he signed the receipt and promise set out in the opinion of Mr. Justice BROOKE. As computed by Nelson, this is the sum of all the money he lost at Council Bluffs, interest upon it, and his expenses. How did Nelson contrive to secure this money? The testimony for plaintiff, if believed, proves beyond question that it was secured by means calculated most certainly to work upon the mind of plaintiff, to induce fear, to cause him at any sacrifice to save himself from represented, threatened, danger, not necessarily of conviction for a crime committed, but of arrest, examination, and perhaps trial for an alleged offense. It is true that Nelson made no threats and said to plaintiff that if he had none of his, Nelson's, money he did not want a dollar. But of what avail was this when by his actions and those of his agents he was also saying,

"I do not believe your denials, I believe you guilty and I want the money."

Smith himself testifies that he had an arrangement with Nelson by the terms of which he was to receive one-half of whatever sum Nelson recovered or received. He has since begun suit against Nelson to recover it. Hooper, also active in the matter, was paid more than $500 by Nelson for his good offices. Very adroitly, the danger in which he stood was represented to plaintiff and to his partner. Plaintiff was not beaten into insensibility with a club, nor confronted with handcuffs or a warrant for his arrest. Probably defendant Nelson and his agents would say that plaintiff's conscience was made particularly active. A fair interpretation of the testimony is that the psychological effect of the suggestions adroitly made to plaintiff was the effect hoped for, producing what Nelson and his agents profited by.

Nor do I agree with the conclusion that the courts are closed to plaintiff even if the money was procured by duress. His demand in this suit is not from consequences of his own illegal or fraudulent acts. It is for money secured from him by intimidation and coercion. Men "such as the plaintiff" are not without redress against those who, using their knowledge of some escapade, succeed in extorting money from them. If this were not so, then reprisals might go on for an indefinite period with safety to the one who best succeeded in creating terror.

Properly enough, in the view he has taken, my Brother BROOKE does not state or discuss numerous points raised by appellant. There are 62 assignments of error. Many of them are answered when it is determined that there was, or was not, a question of fact for the jury. Others are based upon the notion that because plaintiff preserved the receipt given to him

by Nelson, when he paid Nelson the money, and
claimed in his testimony to have relied upon that and
other papers for any protection they might afford him,
from criminal prosecution among other things, that
the court ought to have charged the jury as follows:

"11. If plaintiff's understanding when he paid the
money in question was that he had done something in
connection with the Council Bluffs transaction that
would or might be investigated by the criminal author-
ities or that he would or might be prosecuted thereon,
and he paid the money, gave the note and took the re-
ceipt for his protection against such course, then he
cannot recover."

I find no testimony tending to prove that plaintiff
paid the money to compound a felony. Undoubtedly,
his testimony supports the conclusion that he believed
that by paying the money an investigation of his con-
duct (and Nelson's) at Council Bluffs might be, or
would be, prevented. No such prosecution was even
threatened. It was the imagination of plaintiff, stimu-
lated by the statements and actions, principally of
Smith and Hooper, and the demand of Nelson, which
pictured the possible fate of himself, innocent or guilty,
if what was represented as probable became actual.
Believing the testimony of and for plaintiff, no one can
reasonably conclude that he voluntarily paid the money
to Nelson.

Some reliance is placed by appellant upon the fact
that a considerable length of time elapsed between the
payment of the money and the bringing of this action,
during which the Federal statute of limitations oper-
ated in plaintiff's favor. The fact is material as af-
fecting the estimate the jury should give to plaintiff's
testimony in determining whether he paid the money
under duress. But if the money was paid by duress,
there is no statute of limitations which may be suc-
cessfully pleaded by defendant.

Error is assigned upon rulings admitting and rejecting testimony. Conspiracy of defendants is alleged in the declaration, and considerable latitude was properly allowed in receiving testimony which it was claimed tended to prove, or disprove, concerted action. Whether the court was right in holding there was not sufficient testimony upon the subject of conspiracy to take the case to the jury is a question not presented upon this appeal. An examination of the exceptions relied upon has satisfied me that no prejudice could have resulted to appellant.

Satisfied there was no reversible error committed, I think the judgment should be affirmed.

STONE, C. J., concurred with OSTRANDER, J.

BIRD, J., did not sit.

The late Justice MCALVAY, to whom this case was assigned, took no part in this decision.